IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| Gordon Jewish Community Center, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| Goyim Defense League, Paul Miller, Jon | ) | |
| Minadeo II, Travis Garland, Jason | ) | |
| Beaver, John Does 1-3, and Jane Does 1- | ) | |
| 2 | ) | |
| | ) | |
| *Defendants* | ) | JURY TRIAL DEMANDED |

## **COMPLAINT**

"[T]ake some of the jews, we can cut up into little pieces, you guys can fry them on that grill

back there, then we can feed them to the n**gers."

– Defendant Paul Miller

"It's Time For These Jews & Their Shit Skins to Feel the WRATH OF THE ARYAN

AWAKENING!"

– Defendant Jon Minadeo

The Ku Klux Klan Act was passed more than a century ago to hold accountable those whose

hateful words turn into harmful actions, as happened here. The Gordon Jewish Community Center

("Plaintiff" or "GJCC"), brings this action against the Goyim Defense League ("GDL"), an

antisemitic and racist organization, as well as several neo-Nazi leaders and actors (including Paul

Miller, who actively calls for a race war, and Jon Minadeo, who encourages followers to

1

"exterminate" the Jewish "problem") for their conspiratorial actions leading to trespass, civil rights intimidation, and interference with the use of the GJCC by its members.

## Introduction

Through undersigned counsel, upon knowledge as to itself and its actions and upon information and belief as to all other matters, Plaintiff respectfully alleges as follows:

1.  Plaintiff Gordon Jewish Community Center (GJCC), a registered Tennessee nonprofit corporation, is a cultural institution that has served as a lynchpin of the Jewish community of Nashville for more than 120 years.

2.  Through the decades, the GJCC has offered a space to build community by providing programs and services based on Jewish values and steeped in Jewish traditions. While providing services and programs, the GJCC has strived to live the Jewish commandment (or "mitzvah") of creating an inclusive and welcoming environment and showing kindness to all. During the civil rights era, the GJCC proudly hosted meetings for several inter-racial organizations, dedicated to integrating Nashville's school systems and the general community.

3.  Unfortunately, the GJCC has been targeted for antisemitic activity by those who hold contrary beliefs about inclusion. In 1958, a white supremacist group bombed the GJCC, causing extensive damage to the building.

4.  Additional acts of racial and religious violence directed at the Nashville Jewish community have continued over the decades, including a plan by the Ku Klux Klan to bomb a Jewish temple, attended by some GJCC members, in 1981.

5.  Defendants' actions underlying this lawsuit are the latest acts in this long arc of antisemitic activity directed at Nashville Jews.

2

6.     Defendants conspired to infiltrate Plaintiff's peaceful campus and gain entry into their secured building by hiding inside the bearded disguise of what appeared to be an Orthodox Jewish man. The aim of Defendants' conspiratorial actions was to harass, intimidate, and menace the Jewish community and the GJCC and to send a message that Jews are not safe anywhere, not even in their own private space.

7.     Amongst other claims, Plaintiff alleges that Defendants violated 42 U.S.C. § 1982 and 42 U.S.C. § 1985, the Ku Klux Klan Act of 1871, federal laws designed to prevent precisely the kind of conspiratorial racist activity Defendants perpetrated in this case. Plaintiff additionally alleges that Defendants are liable for the harms caused by their tortious activities that include trespass and fraud. Plaintiff seeks declaratory, injunctive, compensatory, and punitive relief.

## Jurisdiction and Venue

8.     The Court has subject-matter jurisdiction over this action because it arises under federal law, including 42 U.S.C. §1982 and Section 2 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3). It has jurisdiction over the state law claims because they are so closely related to the federal claims as to form part of the same case or controversy. 28 U.S.C. §§ 1331, 1367.

9.     The Court has personal jurisdiction over Defendants in this action because all Defendants knew, or should have known, that the harms would be committed  in Davidson County, Tennessee and because the acts underlying this claim and resulting in the harm described herein were undertaken in Davidson County, Tennessee by at least one of the co-conspirators in furtherance of the conspiracies alleged herein.

10.    Venue is proper because the events giving rise to this action occurred in the Middle District of Tennessee. 28 U.S.C. § 1391(b)(2).

3

## Parties

### A. Plaintiff

11. Plaintiff GJCC is a domestic nonprofit corporation with its principal office in Davidson County, Tennessee. The GJCC is a cultural institution serving the Jewish community of Nashville through arts, fitness, youth, and other programs. Its campus hosts an aquatic center, a preschool, a summer camp, senior programs, and educational programming that engages community members of all ages.

12. The GJCC is a private membership organization with membership open to the public. Its membership-based community center is located on its privately owned 52-acre campus and is a place of public accommodation. It brings this action on behalf of itself and its members.

### B. Defendants

### *GDL*

13. Defendant GDL is an unincorporated association of white supremacists whose mission includes declaring war on Jewish people with the goal of exterminating and/or expelling them from the United States and Europe, subjecting Jews and people of color to harassment, intimidation and violence for the purpose of creating "white nations," and enlisting recruits to aid in achieving these objectives. GDL limits membership based on alignment with its ideology.

14. GDL uses the term "goyim," a Hebrew and Yiddish word to describe non-Jews. The name "Goyim Defense League" is an attempt to mock Jewish people. GDL peddles false conspiracies and perpetuates false stereotypes, including that Jewish persons are deceitful and predatory and are behind an economic, political, and social scheme to undermine white people and that Jews are responsible for bringing Black people and migrants to "white"

4

countries. GDL also perpetuates a stereotype that Black people are responsible for most crimes and that white people are superior.

15.     GDL is a hate-for-profit enterprise that uses antisemitism and racism in combination with confrontation, provocation, harassment, intimidation and violence as tactics for monetary gain.

16.      GDL, via its online products GoyimTV ("GTV"), the GoyimTV Shop, and GTV Flyers, engages in online commerce grounded in white nationalism and antisemitism across the United States, including in the Middle District of Tennessee, with its principal operations in Greene County, Missouri. GTV is a former California limited liability company that continues to operate as an unincorporated business.

17.     GDL engages in hate-based roadshows where members and associates travel to towns with large Jewish and Black communities in order to terrorize those communities in furtherance of their mission to expel all Jewish and non-European descendants from America ("Intimidation Tours"), among other noxious activities.

18.     GDL was founded, managed, and is otherwise directed and organized by Defendant Jon Minadeo, who functions as the chief operating officer or other managing officer, the managing agent, and/or a director of GDL.

19.     GDL leadership includes Minadeo as well as other avowed white supremacists, who create, manage, and profit from GTV, and are active in GDL's intimidation campaigns.

20.     Minadeo directs GDL and its members, and organizes and leads Intimidation Tours, which he offensively calls "Name the Nose Tours" (NTNT), a reference to an antisemitic trope regarding the noses of Jewish people used by antisemitic individuals and groups, including

Nazis during Hitler's regime.[1] He also publishes on, profits from, and helps run GTV and the Goyim Shop.

21.    GDL conditions membership on agreement with its common purpose and organizational missions and requires adherence to its directives as set out by Minadeo.

22.    At least one GDL co-founder refers to GDL members as his "army."

23.    GDL's violent mission and objectives are also evident in the merchandise they sell in support of their aims including, for example, t-shirts with the slogan "Gas the Jews With Us" and "Voting Will Not Remove Them."

24.    GDL has utilized violence, intimidation, and harassment against numerous Tennesseans in pursuit of its objectives and business between July 12, 2024, and the filing of this complaint, leading to multiple indictments and criminal convictions over the past year.

25.    At least a dozen individuals affiliated with GDL have been arrested, charged, and convicted of crimes committed while participating in GDL conspiracies, activities and aims over the last four years. This includes the group's leader, Minadeo, who was sentenced to 30 days imprisonment for criminal littering of antisemitic flyers in West Palm Beach, Florida.

26.    GDL has a history of unleashing neo-Nazi havoc in communities by descending upon a city, engaging in menacing conduct designed to intimidate people based on race and/or religion, and chanting or otherwise directing insults at people who are, or are perceived to be, Jewish and/or not members of "the White race." Such insults include threatening statements like

---

[1] *See*, *e.g.*, United States Holocaust Memorial and Museum, *Antisemitism: An Introduction*, https://encyclopedia.ushmm.org/content/en/article/antisemitism (Jan. 10, 2025); Yale Law School, Lillian Goldman Law Library*, Nazi Conspiracy and Aggression Volume IV, Document No. 1778-PS,* https://avalon.law.yale.edu/imt/1778-ps.asp (last visited Dec. 9, 2025) (a collection of "Documents in Law, History, and Diplomacy," partial translation of document 1778-ps, Nazi propaganda).

6

"Jews will not replace us," "Jews get the rope," "White Power," and "Heil Hitler." They also directly confront, provoke, and threaten people in an effort to engage in violence motivated by race or religion; wave swastika flags; and litter Jewish neighborhoods and synagogues with antisemitic flyers in plastic bags weighted down with corn, rocks, rat poison, or pellets that resemble rat poison. These activities are often conducted as part of Intimidation Tours. The intent of the Intimidation Tours is both commercial and malevolent.

27.    The purposes of the Intimidation Tours include targeting people they believe to be Jewish or Black for harassment and intimidation, and to engage in violence against them, to further GDL's goal to "exterminate" and/or "expel" people who are Jewish or Black from the United States. For instance, during Nashville's Intimidation Tour, there were at least two victims attacked based on their perceived racial identities. During an Intimidation Tour in Orlando in February 2022, a Jewish student was spit on, punched, kicked, sprayed with a chemical agent and had his phone stolen and destroyed.

28.    Another purpose of the tours is to generate videos of the acts of harassment and intimidation that can then be shared online and used to further harass and intimidate victims, as well as for GDL's commercial gain and recruitment.

29.    The harassment, intimidation, violence, and unlawful activities directed at people perceived to be Jewish do not end when the GDL members leave a community at the end of an Intimidation Tour. GDL members are directed to continue their actions "IRL," also known as "in real life" activities and to upload or send video and documentation either directly to GDL leadership or to upload via GTV.

7

30. GDL conducts its business through the ownership and operation of the video website GTV, which livestreams and publishes GDL-created and branded videos, and GoyimTV Shop, which is promoted through GTV and sells white supremacist and antisemitic products.

31. On GTV, GDL engages in a hate-for-pay scheme in which it publishes white supremacist and antisemitic content and broadcast "in real life" activities that includes live footage of racially or religiously motivated harassment, intimidation, threats, and assaults on its victims. GDL and its members use GTV to solicit "donations" in support of their confrontations, harassment, intimidation, and violence against Jews and people of color and their supporters, and those viewed as not members of "the White race."

32. GDL members follow and mimic the actions, intimations, and directions of their leader and founder, Minadeo. Examples of Minadeo's actions that have been repeated by GDL members include assaulting bystanders with intimidating and aggressive racist and antisemitic slurs, infiltrating Jewish communities and/or buildings, and going in disguise for the purpose of intimidating and threatening their victims. They film the encounters in order to publish them on GTV to facilitate the online harassment and intimidation of their victims.

33. GTV, as an asset and instrumentality of GDL, is both a platform and content provider for GDL and its members. It collects money by publishing the incidents of provocation and harassment by GDL members and allows followers to pay for an opportunity to get recognized by GDL leaders and other white supremacists during livestreams. Those payments are in turn used to fund further racist and antisemitic intimidation, and harassment. It also provides a platform to host the GDL shop, which sells racist and antisemitic merchandise—like GDL-branded antisemitic flyers, Hitler masks, and "swastika soap."

34.    The GDL engaged in activities in Tennessee connected to the conspiracies outlined herein and continues to engage in commercial activities in Tennessee.

### *Jon Minadeo II*

35.    Defendant Minadeo is domiciled in Greene County, Missouri. He is the co-founder, and a leader, director, managing agent, and/or a member of GDL. Minadeo is, or acts in the capacity as, GDL's president and chief executive officer. He owns, in full or in part, GTV. He uses the pseudonyms "Handsome Truth" and "Abrahamic Lincoln," and is referred to by others as "Euguene" and "Shoobie" or "Shooby."

36.    Minadeo's antisemitic activity, according to his own admission, has resulted in his being banned from numerous platforms, apps, and businesses. As he proudly posted in 2023: "HT [Minadeo] Banned From: Pay Pay, AIRBNB, YOUTUBE, ODYSEE, JP MORGAN, CHASE, CASH APP, ZELLE, Buy Me A Coffee, Stripe, Twitter, Tik Tok, D-Live, Twitch, Instagram, Enterprise Car Rentals and NOW MACON-BIBB COUNTY GEORGIA!"

37.    Minadeo organized and travelled to Tennessee in 2024 to intimidate and harass Jewish and other people and participated in activities associated with the conspiracies outlined herein.

38.    Minadeo's public statements[2] evidence his goal in founding and operating GDL, as well as its mission. These statements include:

- "Now its our turn to kick the jews and n****s back to their homes!"

- "It's Time For These Jews & Their Shit Skins[3] to Feel the WRATH OF THE ARYAN AWAKENING!"

- "WAKE UP WHITEY! IT'S TIME TO FIGHT!"

- "JEWS WERE NEVER SUPPOSED TO BE ALLOWED IN AMERICA THEY ARE MONGRELS FROM SATAN'S NUT SACK! THEY ARE NOT EUROPEAN.

---

[2] Redactions inserted by counsel for Plaintiff.

[3] GDL, and other white supremacists, use the insult "shitskin" to refer to people of color.

9

SO EVERY LAST JEW ON OUR SOIL NEEDS TO PACK IT THE F*CK UP AND GO! #F*ckAllJews."

- "YOU JEWS BETTER PACK IT THE F*CK UP REAL SOON ! BECAUSE WHEN AMERICA WAKES UP... IT'S F*CKING OVER ! I CAN'T WAIT…"

- "See you later, Jew. We're gonna expel you!"

- "Put your face where I can shoot it, n****r."

- "These N****RS need to get the f*ck out of our country"

### *Paul Miller*

39. Defendant Paul Miller ("Miller") is domiciled in New Jersey. He is a neo-Nazi provocateur who operates a commercial enterprise engaged in hate-for-profit video streaming and merchandising.

40. Miller is a white supremacist and antisemite who uses various online platforms, including GTV, to recruit followers and harass and abuse people, including children, who are or appear to be Jewish, Black, Brown, or of an ancestry that does not align with white supremacists' views about who is considered a member of the white race.

41. The objectives of Miller's online activities include accelerating the start of a race war that will "return" America to white rule. He advocates, among other dangerous and violent actions, that his followers could "take some of the jews, we can cut them up into little pieces, you guys can fry them on that grill back there, then we can feed them to the n**gers."

42. Miller has multiple aliases under which he streams, posts and chats, including "Gypsy Crusader," "Punisher," "Homelander," and "Joker."

43. At one point, Miller had more than 14,000 followers on GDL-owned GTV. His hateful and antisemitic content is shared with more than 250,000 followers on X (Twitter), 50,200 subscribes on Telegram, and 6,400 followers on his own streaming site, Crusaders.gg.

10

44. Miller has paid and/or unpaid staff or "admins," including Garland, who assist with his commercial enterprise in the form of video streaming antisemitic and white nationalist propaganda, harassment and abuse.

45. Miller encouraged, helped plan, and participated in Garland's criminal activities at the GJCC as described herein.

46. Miller, as a co-conspirator, knew about and conspired with Garland's activities targeting the GJCC in Tennessee and could reasonably expect those activities to lead to the harms outlined herein.

### *Travis Keith Garland*

47. Defendant Travis Keith Garland ("Garland") is domiciled in Tennessee. He is a member and/or associate of GDL, and an administrator working for Miller's hate-for-profit video streaming enterprise.

48. Garland is currently on probation following his guilty pleas in Davidson County Criminal Court to Civil Rights Intimidation, Trespass, and Assault, stemming from his attempt to infiltrate the GJCC as described above.

49. In white supremacy circles, he uses the pseudonym "Kitchenwaffen" and is referred to as "Kitchen."

50. Garland is a co-conspirator and took direct and overt actions in furtherance of the conspiracies outlined herein.

### *Jason Beaver*

51. Defendant Beaver is domiciled in Florida. He works for Miller as an administrator of his hate-for-profit video streaming enterprise and helped plan Garland's criminal activities at the GJCC as described herein.

52. In white supremacy circles, Beaver uses the pseudonym "Kitler.".

53. Beaver, as a co-conspirator, knew about and conspired with Garland's activities targeting the GJCC in Tennessee and could reasonably expect those activities to lead to the harms outlined herein.

### *John and Jane Does*

54. Defendants John Does 1-3 and Jane Does 1-2 helped plan and encouraged Garland's criminal activities at the GJCC as described herein and may work for Miller as administrators of his hate-for-profit video streaming enterprise. Their identities are currently unknown.

55. John Doe 1 uses the pseudonym, "Ricky Vale."

56. John Doe 2 uses the pseudonym, "Chad."

57. John Doe 3 uses the pseudonym, "Slaying."

58. Jane Doe 1 uses the pseudonym, "Boogadoo Johnson."

59. Jane Doe 2 uses the pseudonym "Sylvia."

60. Doe defendants, as co-conspirators, knew about and conspired with Garland's activities targeting the GJCC in Tennessee and could reasonably expect those activities to lead to the harms outlined herein.

61. All Defendants contributed to the damages suffered by Plaintiff.

### **Factual Allegations**

A. **Defendants GDL, Minadeo and Garland Travel to Nashville in July 2024 to Target Nashville's Jewish Community for Harassment and Intimidation and to Engage in Religiously and Racially Motivated Violence ("GDL Conspiracy").**

62. Beginning in or around spring and summer 2024, GDL and its associates began planning a campaign to target Nashville's Jewish community and communities of color. After extensive chats, messages, calls and other communications arranging travel, housing, and materials (including flyers for illegal littering), GDL members initiated their conspiracy by traveling to Nashville in July 2024. They did so with the express purpose of harassing, threatening,

12

intimidating, abusing, and menacing Jewish people, and engaging in violence against people in Nashville who they perceived to be Jewish and/or Black whenever it appeared they could do so without being arrested (e.g., under cover of darkness) ("GDL Conspiracy").

63. Defendants Minadeo and Garland participated in the GDL Conspiracy discussions and traveled from their respective homes to meet in Nashville to take part in the conspiracy. These discussions took place on GDL channels of communication as well as in the Kentucky rental home in which GDL members stayed during the first leg of the GDL Conspiracy.

64. GDL members, including Minadeo and Garland, kicked off their campaign by convening with other GDL associates in Nashville on or around July 12 or 13, 2025, in order to further the GDL Conspiracy by, among other activities, physically confronting, provoking, harassing, intimidating, and assaulting people who they perceived to be, Jewish, Black, or otherwise not members of "the White race." In addition, they illegally spread antisemitic propaganda, and to used footage of the violence, harassment, intimidation, and assaults in Nashville to further harm their victims through their online platforms.

65. The Nashville Intimidation Tour was the GDL's sixth so-called "Name the Nose Tour." It was attended by approximately twenty-five GDL members and/or associates.

66. Minadeo, as the CEO and mastermind of GDL, was responsible for logistical planning, including choosing Nashville as the site for this Intimidation Tour.

67. For ten days in July, more than a dozen GDL associates marauded through Nashville waving swastika flags and screaming obscenities. Among other abusive and threatening actions, and as set out in more detail below, members of GDL harassed a group of Black children, littered lawns and telephone poles with antisemitic flyers, and viciously assaulted two young men because of their perceived race and/or Jewish ancestry.

68. As is part of their modus operandi, GDL photographed and livestreamed[4] their activities in Nashville, so that they could share it with a wider audience and use it for fundraising.

### i. *GDL members and/or associates attack a young man of Jewish descent in furtherance of the GDL Conspiracy.*

69. On or about the evening of July 13, 2024, more than a dozen members of GDL gathered in a parking lot on or near 9th Avenue South in Nashville.

70. There, they encountered a young man of Jewish descent who was next to a parked pickup truck.

71. In furtherance of the GDL Conspiracy, GDL members surrounded the young man and began to antagonize, harass, intimidate, and attempt to provoke him into a confrontation.

72. The young man was targeted based on his actual or perceived status as a Jewish person. Members and/or affiliates of GDL commented about "the six in the nose"—an antisemitic slur originating during Nazi Germany. This slur was popularized by, among others, Julius Streicher (publisher of the Nazi propaganda newspaper *Der Stürmer*) as part of Nazi propaganda including the "anti-Jewish propaganda book titled *Der Giftpilz*" (The Poisonous Mushroom) that claimed Jewish people can be identified "by his nose. The Jewish nose … looks like the number six. We call it the 'Jewish six.'"[5]

73. GDL members also made other antisemitic comments about the young man "fucking" and "sucking Bibi [Netenayahu]'s dick," a reference to the Prime Minister of Israel.

---

[4] Livestreaming is the streaming of video over the internet in real time.

[5] *See*, *e.g.*, United State Holocaust Memorial and Museum, *Julius Streicher,* https://encyclopedia.ushmm.org/content/en/gallery/julius-streicher (last visited June 11, 2025).

74.	When the young man tried to leave, Minadeo remained in the vehicle's doorway, impeding the driver's ability to close the door, and laughing at his requests to be left alone. GDL members and/or associates filmed the interaction.

75.	Without warning or provocation, one of the GDL associates struck the young man in the face and neck with a fighting technique called a "spinning elbow" – a powerful striking technique in martial arts where a combatant generates significant force by spinning their body to deliver an elbow strike from an unexpected angle.

76.	As soon as his GDL associate struck the young man, Minadeo directed his members, "here we go," and his co-conspirators sprang into action.

77.	As the young man tried to get away, GDL members kicked him several more times, grabbed him, and body-slammed him against the truck.

78.	The young man was eventually able to get in his truck and leave, after which Minadeo and his GDL associates congratulated each other and celebrated with Heil Hitler salutes and cries of "white fucking power!"

79.	One GDL member acknowledged that, if given the opportunity, the group would have done more harm to the young man. He told his fellow GDL members that he "was trying to grab him [the Jewish man]… I would've choked that motherfucker out."



*Image 1 – Video republished by WTVF Nashville showing GDL members celebrating after attacking the young man.*

80. The incident was broadcast on various white supremacist platforms by GDL members and/or associates to drum up support and enthusiasm for additional acts of white supremacist violence.

81. One of the GDL associates involved in the incident was convicted of assault and civil rights intimidation for his attack on the young man. He is currently incarcerated awaiting sentencing.

> **ii.** **_GDL members and/or associates harass and intimidate young Black children in furtherance of the GDL Conspiracy._**

82. On or about July 14, 2024, the day after the parking lot attack, and in furtherance of the GDL Conspiracy to interfere with the rights of Jewish and/or Black people, about twenty members of GDL took to the streets and sidewalks of Nashville. They gathered at or near the corner of Lower Broadway and 3rd Avenue North and marched through downtown Nashville. Many

16

wore GDL t-shirts that are sold on GTV that read "Whites Against Replacement."[6] Some

members carried large swastika flags on metal or wooden poles.

83. Four young Black boys, aged eight to eleven, who regularly play bucket drums to entertain

people to get tips, were downtown when they encountered about half a dozen GDL members,

including Minadeo.

84. The grown men verbally harassed and intimidated the boys, using versions of the n-word

(e.g., "n\*\*grs," "n\*glets," and "n\*gglings") nearly a dozen times and referring to the

children as monkeys, while filming themselves and the children.

85. Police intervened and escorted the boys away from the mob while GDL members jeered,

raised their arms in Heil Hitler salutes, and called them "faggots" and other slurs.

86. Because of the encounter with GDL, the boys did not entertain tourists on that day and scared

to return downtown to drum.

### iii. *GDL members and/or associates attack a young biracial man as part of the GDL Conspiracy.*

87. On or about the afternoon of July 14, 2024, a contingent of a dozen or more GDL members

marched past a young biracial man taking a break outside his employer, Johnny Cash's Bar

and BBQ. As they passed the man, GDL members used antisemitic and racially charged

language in a menacing manner, including calling him a "n\*\*ger baby."

---

[6] The "great replacement" theory is a conspiracy that "fosters the belief that leftist and Jewish elites are engineering the ethnic and cultural replacement of white populations with non-white immigrants that will lead to a 'white genocide.'" Reuters, *Explainer: What is the 'Great Replacement' and what are its origins?* (May 16, 2022, 2:13 PM EDT), https://www.reuters.com/world/us/what-is-the-great-replacement-what-are-its-origins-2022-05-16/. It has been cited by perpetrators of mass violence against Jewish and other populations, including the perpetrator of the mass shooting at a Pittsburgh synagogue in 2018. Newsweek, *'Great Replacement Theory' has inspired 4 mass shootings in recent years* (May 16, 2022, 4:47 PM EDT), https://www.newsweek.com/great-replacement-theory-inspired-terror-attacks-recent-years-1706953.

88. GDL associates and/or members surrounded the young biracial man. Believing himself in threat of imminent harm, the young man struck one of the GDL members and then immediately retreated.

89. Minadeo directed his members to "GET HIM!"

90. Even though the young man had retreated, was unarmed, and did not pose a threat, eight to ten GDL members and associates rushed after him, quickly surrounded him and began attacking him.

91. Minadeo jumped on the young man's back, put him in a chokehold, and attempted to gouge out his eyes. While Minadeo choked and dug his fingers into the young man's eyes, other members of GDL kicked, punched and otherwise further assaulted him. A GDL associate struck the young man with the pole of a swastika flag in the face and the ribs while other GDL members held, filmed and/or attacked the young man.

92. The young man was surrounded and terrified for his life. He eventually broke free and escaped by running into moving traffic.

93. The young man was targeted for attack based on his race.

94. A GDL member was charged with and pled guilty to assault of the biracial young man.

   *iv.* ***Additional Acts of Intimidation and Harassment in Furtherance of the GDL Conspiracy During July and in the Ensuing Months***

95. Throughout their July tour of Nashville, GDL associates engaged in activities on public property and in places of public accommodation in furtherance of their conspiracy, including but not limited to:

   • Throwing things at people who were perceived as Jewish, Black or their supporters;

   • Directly provoking, intimidating and harassing people who were perceived as Jewish, Black or their supporters by yelling in their faces;

18

- Running up to people who were perceived as Jewish, Black or their supporters and pretending that they were going to hit them;

- Disrupting a meeting of the Metro Nashville City Council by intimidating attendees, verbally abusing people, and yelling racial slurs at city council members council and others; and

- Threatening to engage in violence against people who were perceived as Jewish, Black or their supporters.

96. Defendant Garland participated in the July tour of Nashville by, among other activities, engaging in a dangerous demonstration on an Interstate 65 overpass, unlawfully attaching antisemitic propaganda to utility poles, and unlawfully distributing antisemitic propaganda on public and private property in the Belle Meade and Riverside neighborhoods near the Gordon Jewish Community Center.

97. GDL's campaign against Nashville's Jewish community and communities of color continued after the GDL members left Nashville in July. For example, GDL members in person and on GDL platforms:

- Threatened to start "WW3" by targeting Nashville because of Nashville's Jewish population:



*Image 2 – GDL member threatening Nashville's Jewish population*

- Encouraged others and/or threatened to "jump" one of the young men they had assaulted and to "curb stomp," "beat" and "repeatedly" shoot him. For example:



*Image 3 – GDL Member encouraging others to further target and assault a peceived as being Jewish*



*Image 4 – GDL member encouraging others to kill a man percieved as Jewish*



*Image 5 – GDL Members encouraging others to beat a Black man.*

- Made death threats against the Davidson County District Attorney, after he charged several criminal cases against GDL associates:




*Images 6 and 7 – GDL members making death threats against the Davidson County District Attorney Glenn R. Funk*

**B. Miller, Beaver, and Doe Defendants Enter an Intersecting Conspiracy Also Meant to Target Jews of Nashville ("Miller Conspiracy")**

98.　In late December or early January, Miller, entered into a related and overlapping conspiracy with Garland, Beaver, and Doe defendants ("Does").

99.　This conspiracy between Garland, Miller, Beaver and Does ("Miller Conspiracy") was undertaken with the purpose of furthering the shared goal of the GDL Conspiracy, namely to harass, intimidate and menace Jewish people in Nashville in order to create fear and anxiety so that Jews would not feel safe anywhere in Nashville.

100.　Garland, Miller, Beaver, and Does ("Miller Co-conspirators") devised a plan to infiltrate the GJCC, targeting its members in an effort to intimidate them and to deprive them of their civil rights. While Garland would be the only conspirator on the ground in Nashville, Miller and Does helped plan the criminal intrusion by providing direction, support, and encouragement before, during, and after the planned action.

101.　On or about January 5, 2025, Garland, who goes by the pseudonym "kitchenwaffen" on GTV livestreams and within Miller's commercial enterprise, traveled several hours from Maryville, Tennessee back to Nashville.

102.　Garland donned a disguise—a fake beard with peyot sidelocks,[7] black coat, and white silk scarf—to make himself appear as an Orthodox Jewish man. He then entered the Nashville Holocaust Memorial, a sacred space on the campus of the GJCC.

---

[7] Peyot are the sidecurls worn by some Jewish men and boys, particularly in Hasidic and ultra-Orthodox communities. The practice comes from a verse in the Book of Leviticus that forbids shaving the "side, growth of [the] beard," which has been interpreted to refer to the hair on the head and cheeks. Styles and levels of observance vary, but peyot remain a recognizable sign of Jewish tradition. *See Browning v. Seifert*, No. 1:13-cv-23, 2015 WL 1280948, at *55 n.31 (N.D.W. Va. Mar. 20, 2015).

21

103. While disguised as an Orthodox Jewish man at the Holocaust Memorial on the GJCC campus, Garland recorded and livestreamed himself waving his two middle fingers, desecrating the religious artifacts that had been placed by community members in acts of remembrance and respect for the deceased, describing Jewish people as sucking "baby dicks," and otherwise mocking the Holocaust that killed more than six million Jews.



*Image 8 – A screen capture of a video a GDL member recorded of himself dressed as an Orthodox Jewish rabbi waving two middle fingers at the Nashville Holocaust Memorial*

104. Garland's activities at the Holocaust Memorial were for the purpose of commercializing antisemitism as part of the business of GDL and Paul Miller's enterprises, and to do reconnaissance and drum up interest and support for a second GDL mission in the future.



*Image 9 – Screenshot showing the username, profile picture, and biography of Garland's GDL Telegram account.*

105. In furtherance of both conspiracies, Garland titled his actions "hate week." He raised funds on GDL's GTV platform to engage in more antisemitic and racist activity that was to be the culmination of "Hate Week."



*Image 10 – Screenshot of one of Garland's GDL posts & streams promoting his "hate week" activities*

106. After Garland's visit to the Holocaust Memorial, co-conspirator Miller, who goes by the username "GypsyCrusader," drummed up support and encouragement for Garland's next "Hate Week" action by posting, or allowing to be posted, a picture of Garland in his disguise on his "GyspsyCrusaderClips" platform with the teaser: "Kitchen waffen is going to pull a pretty funny stunt in the coming days."



*Image 11 – Post promoting Garland's "Hate Week" Actions Targeting the GJCC*

107. It is a well-known practice among neo-Nazis and white supremacists who engage in dangerous provocations and/or often unlawful activities to mischaracterize their actions as comedic "stunts" in order to avoid liability or pre-emptive actions by law enforcement by attempting to conceal or minimize the actions.

108. As promised by Miller and Garland, on the evening of January 13, 2025, Garland returned to the GJCC campus in a similar disguise, this time to gain entry into the main GJCC building, a secured-entry building requiring either an electronic key or a valid reason to be granted access by GJCC staff.

109. Prior to entry, Garland parked in the GJCC parking lot while filming himself and talking with the Miller Co-conspirators – including Miller, Beaver and Does – via Telegram Video

Chat ("Video Chat"). He remained on the Video Chat throughout his time on GJCC's property.

110. Speaking with the Miller Co-conspirators as he approached the GJCC building, Garland's nefarious intentions were clear. Garland lamented that people were walking past his car and was afraid that "they're going to see me. I hope they don't fucking raise the alarm before I can get in there."

111. The Center was locked and about to close when Garland arrived, but he managed to gain entry by appearing in his disguise in order to get buzzed in by the receptionist, who was at the desk providing access to GJCC members and guests who were meeting for an after-hours basketball game.

112. Garland approached the receptionist and, using an accent meant to mock Jewish speech and culture, demanded to speak with a rabbi.

113. Despite being told that no rabbi was present he nonetheless walked past the front desk and attempted to enter through another secured door.

114. When asked and/or otherwise directed to stop and denied further entry, Garland refused to leave. Instead, he attempted to infiltrate further into the Center and tried to get through doors to additional office and community spaces in the GJCC. Concerned about what the disguised man – who was livestreaming his actions – would do, a GJCC member and another man there to play basketball stepped forward to physically block Garland's ability to get further into the GJCC.

115. Garland pushed against the two men as he attempted to get further into the GJCC building. As the two basketball players attempted to stop Garland from entering further into the GJCC,

the receptionist radioed an urgent request for a security guard to assist. The security guard rushed to the front area where Garland continued his efforts to infiltrate the building.

116. The guard directed Garland to leave, which he again refused to do, until the guard placed his hand on his gun and physically escorted Garland out of the building.

117. While outside, the security guard radioed the GJCC receptionist and urgently asked her to call 9-1-1. Believing that the security guard's life might be in danger, the receptionist immediately called 9-1-1 and requested police assistance.

118. Once outside of the GJCC building, the guard continued to escort Garland out of the GJCC parking lot, all while Garland and Miller hurled racial slurs at the security guard, who was of Asian descent. As the security guard escorted Garland off the property, Garland held up his phone for his viewers to better view what was happening.

119. Throughout his time in the building and on GJCC's property, Garland remained on the phone with Co-conspirators, including Miller, who was directing Garland.

120. While escorting Garland off the property, the security guard felt threatened and unholstered his gun in order to be prepared for an attack and to secure it from being taken by Garland. Because Garland was being instructed by the Miller Co-conspirators via the Video Chat to get in his car, the guard became fearful that Garland had explosives in his vehicle.

121. Once Garland was off the property, the security guard locked the parking lot gates and waited for the police to arrive.

122. Garland continued his livestream of the Video Chat as he walked around the perimeter of the property. He sought out another point of entry so that he could retrieve his vehicle from the parking lot but failed. Eventually, he returned to the parking lot gate, where the security guard and police officers had gathered.

26

123. He was later arrested.

124. In the aftermath of his trespass at the Center, Garland bragged that he had "stormed the temple" and posted a video of the incident on a Telegram group channel.

125. In the post, Garland admitted that he "wore the rabbi costume and went into their jew building harassing them. . ."

126. In another post, referencing the security guard and incident, he wrote and admitted that "he was a [anti-Asian slur] defending the jews i stormed their temple. . ."

127. As Garland acknowledged in the same post, he coordinated with other Miller Co-conspirators to capture his actions on Video Chat ("vc") on livestream so that it could be more widely shared.



*Image 12 – Telegram post from Garland*

128. Garland also admitted that his motive was to force his way into the building in order to "harass" Jewish people:



*Image 13 – Telegram post from Garland.*

129. A few days after Garland's trespass at the GJCC, law enforcement booked him on an assault warrant because of the incident. He was charged with two counts of civil rights intimidation, assault of an officer and trespass, and was held on a $500,000 bond.

130. Garland later pled guilty to Civil Rights Intimidation, Assault, and Trespass in Davidson County Criminal Court cases 2025-A-99 and 2025-A-561.

**C. Defendants Miller, Does, GDL and Minadeo Provided Guidance, Assistance and Encouragement to Garland in Furtherance of Both Conspiracies**

    ***i.*** *<u>Miller and Doe Defendants Provided Guidance, Assistance and Encouragement to Garland in Furtherance of the Miller Conspiracy</u>*

131. Co-conspirators Miller and Does played a pivotal role in making Garland's trespass and harassment of Plaintiff possible. Garland acknowledged that the Miller Co-conspirators helped plan the event when he was recorded saying to Miller, Beaver, and Does, all of whom were on the Video Chat to watch, direct, and/or participate in his "Hate Week activities," that "[t]hese things are so hard to plan when you don't have somebody helping you. I mean, you guys are helping me but you know what I mean, like, in person."

28

132. Co-conspirator Doe 1, "Ricky Vale," had arranged to record, and did record, the incursion. His prior knowledge was also reflected in his offer to have "Ms. Ruby" call the GJCC to ask that they let Garland back on their property to retrieve his car ("want Ms. Ruby to call them and tell them to let you get your fucking car?").

133. Reflecting his prior knowledge of the plan, Beaver brainstormed ways to assist Garland by suggesting that "[s]omeone needs to call the [Gordon Jewish Community] Center and tell them to let you get in your car and leave."

134. As set out above, throughout his time in the building and on GJCC's property, Garland remained on the phone with Co-conspirators, including Miller, who were directing Garland.

135. Miller participated in the conspiracy in real-time by directing Garland's actions and attempting to interfere with, and intimidate, the security guard's authorized commands to leave the property, even threatening the guard. For example, Miller commanded the guard to "put the motherfuckin gun away you chink motherfucker unless you want to go to prison." Miller repeatedly directed Garland to get to his car, which created reasonable fear in the guard that there were weapons in the car. When the security guard directed that Garland get away from his car, Miller told Garland to "get in the car, goddamit," causing even greater alarm.

136. As he was escorted off the property, the Miller Co-conspirators provided guidance and encouragement. Defendant Miller instructed Garland to "get in the car and drive away." Then, when they learned that the security guard called the police, Miller further instructed Garland to "tell them [the police] it was a prank, tell them you were just trying to be funny. You were doing something for the internet. You're unarmed. You just want to get in your car and you want to leave, show them your ID then get in your car."

29

137. During the livestream, while Garland wandered outside the GJCC trying to figure out how to get his car which was parked behind now-locked gates in the GJCC parking lot, Miller further acknowledged his role in the conspiracy by admitting that "You know something? This was our fault … we should have said to you [Garland] not to park in their parking lot. You should have parked across the street and walked across that way you could have just got in the car and drove away." He also said, "we should never have let Kitchen [Garland] do this."

138. Miller also admitted his knowledge that the activities he and Co-conspirators planned was nefarious, telling the other livestream participants, "see? This is why this shit is dangerous."

139. Miller also made clear that Garland was acting within the scope of a business relationship, commenting: "That's all I need, for one of my admins to get shot by a fucking chink for a prank." Miller further acknowledged the business relationship between him and Garland, commenting that "we almost lost an admin on the job."

140. Miller streamed and or published all or part of the incursion on one of his many video outlets as part of his hate-for-profit commercial enterprise.

141. Miller referred to Garland as "one of our top guys."

142. Miller and Beaver hired Garland an attorney for his criminal case and are in touch with the attorney about Garland's case.

   ii.   *Defendants GDL and Minadeo Provided Guidance, Assistance and Encouragement to Garland in Furtherance of the GDL Conspiracy*

143. While Garland conspired with Miller and Defendant Does to execute the specifics of his plan of intimidation and trespass into the GJCC in furtherance of the Miller Conspiracy, he also continued to conspire with and act on behalf of GDL and Defendant Minadeo. Indeed, Garland's decision to drive to Nashville in order to target the GJCC – rather than targeting a

30

Jewish institution closer to his residence in Knox County – was driven by his desire to continue the GDL Conspiracy and objectives of the Nashville Name the Nose Tour.

144. Garland joined GDL's Intimidation Tour in Nashville and participated in its malicious activities directed at intimidating and menacing Jewish people. Garland engaged in unlawful activity while in Nashville by attaching GDL fliers to utility poles. He filmed and uploaded clips of his actions to the GDL "NTN" channel in July 2024 and sent evidence and indicia of his activities to Minadeo for approval.

145. In the months preceding the trespass into the GJCC, Garland remained active with GDL and continued to update Minadeo on his efforts at intimidating Tennessee Jewish communities.

146. On October 11, 2024, Garland sent a news article reporting on antisemitic GDL flyers being illegally distributed in Knox County, Tennessee. Minadeo responded with a message asking simply "you?" and sending a nazi salute.

147. In December 2024, Garland downloaded an image of Minadeo's GDL persona, "Handsome Truth," and pictures of GDL in Nashville for use as content.

148. On or about January 6, 2025, between his first and second intrusions onto GJCC property, Garland downloaded a screenshot of a news article about GDL's July Intimidation Tour.

149. Copying Minadeo's branding of the approximately week-long Nashville Name the Nose Tour, on or about January 7-11, 2025, Garland used GDL communication channels to fund-raise and generate support for his "Hate Week" activities, including his actions in "storming the Jew temple" to trespass and "harass the Jews."

150. On or about January 11, 2025, Garland downloaded a GTV icon for use as content and to brand his GJCC activities.

151. On January 11, 2025, in response to a message Garland sent Minadeo after his first intrusion onto GJCC property, which Garland engaged in, in part, to create content for the benefit of GDL, Minadeo responded "this is fucking awesome."

152. In disguising himself as a Jewish man during the intrusion into the GJCC, Garland followed Minadeo's tactics and GDL practices. Minadeo disguises himself as a Jewish man in order to mock Jewish people, infiltrate Jewish places, and intimidate Jewish people, filming himself and posting his intimidation and provocation on GTV as content to generate income. Other GDL members and/or associates likewise disguise themselves for similar purposes. As further reflection of Garland's actions originating in the GDL Conspiracy, five hours after his attempt to infiltrate the GJCC and before leaving Nashville to drive back to his home in Maryville, TN, Garland took a picture of the outside of the bar where the GDL attacked the young biracial man in July as part of their "Name the Nose Tour."

153. Once he was safely off the GJCC property, Garland called Minadeo to report that he was unhurt and to discuss his efforts to infiltrate the Jewish community center.

154. By recording the incursion, Garland intended to publish and otherwise broadcast his trespass and harassment on the GDL Telegram channel and GTV in furtherance of GDL's mission.

155. After his arrest, Minadeo sent a GDL agent and member, Colby Frank, to speak with Garland's girlfriend to provide "legal advice."[8]

---

[8] Frank is not a lawyer but appears to frequently provide legal advice to family and friends, including Defendants in this lawsuit. *See e.g.,* Tim Dickinson, *Neo-Nazi Litterbug Is Spending Thanksgiving in the Slammer*, Rolling Stone (Nov. 22, 2023) https://www.rollingstone.com/politics/politics-features/jon-minadeo-neo-nazi-goyim-defense-league-leader-jail-1234894095/.

**D. Defendants' Racist Conspiracies Harmed Plaintiff and Its Members**

156.  As a result of Defendants' conspiracies, staff and members of the GJCC suffered emotional injuries and became more anxious on the property.

157.  GJCC staff members were required to spend significant time responding to community and members who were concerned by the invasion of an antisemite rather than conducting their regular business at the GJCC.

158.  In addition, some staff and members of the GJCC changed the way they used the property by becoming hypervigilant when allowing access into the GJCC, a place of public accommodation; requiring sign-ins; and carrying identification when coming to the GJCC's campus.

159.  Plaintiff also suffered significant economic damage and changed their use of security protocols on the property. They invested in increased security services, costing them approximately $75,000 for extra security coverage and facility updates.

**Causes of Action**

**COUNT ONE:**

***Property Rights of Citizens Under 42 U.S.C. § 1982***

***Plaintiff v. All Defendants***

160.  Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

161.  This claim arises under 42 U.S.C. § 1982, which prohibits race discrimination in the right to hold and enjoy real and personal property. Jewish people are a protected class for the purposes of 42 U.S.C. § 1982.

162.  By conspiring and acting to intimidate and harass Plaintiff by dressing in disguise, refusing to leave, intimidating staff and members, and assaulting a security guard, Defendants

33

intentionally deprived Plaintiff and Plaintiff's members of their right to hold and use real property on an equal basis.

163. Plaintiff and Plaintiff's members altered their use of real property based on Defendants' actions described herein by, without limitation, interfering with members' and staff's sense of safety on the property, and causing the GJCC to initiate new security protocols and change work schedules.

164. The GJCC was intentionally targeted by Defendants because of its affiliation with the Nashville Jewish community.

165. By conspiring to target Jewish people in Nashville to deprive them of their right to access places of public accommodation on an equal basis and to interfere with their right to use and hold real property, Defendants' deprivation of Plaintiff's Section 1982 right to equal use of their property was a reasonably foreseeable outcome of both the GDL Conspiracy and the Miller Conspiracy.

166. Both conspiracies involved an agreement to deprive Plaintiff and Plaintiff's members of their right to hold and use personal property on an equal basis. All Defendants agreed to and were involved in the planning of their respective conspiracies outlined above and herein.

167. In trespassing, menacing, and intimidating members and staff of the GJCC, Defendant Garland took an overt act to further both conspiracies.

168. Garland was acting within the scope of his agency as an administrator and paid or unpaid employee of Miller's commercial enterprise, within furtherance of its business and at the command, direction or authorization of Miller, who participated in, directed, and ratified his actions.

34

169. Defendants Miller and GDL are vicariously liable for the violations of § 1982 by virtue of implicitly or expressly authorizing Garland's actions in invading the GJCC, as described herein, where Garland was acting as an agent of and to the benefit of Miller and/or GDL.

170. Defendants committed the acts herein alleged maliciously, fraudulently and oppressively with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiff. Further, the conduct of individual defendants Miller, Minadeo, Garland, Beaver, and/or Does was also authorized and/or ratified by an owner, officer, director or managing agent of Defendant Goyim Defense League and/or by Defendant Miller. In light of Defendants' willful, knowing and intentional discrimination against Plaintiff, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

171. As a proximate cause of the conspiracy described herein, the GJCC and its members no longer enjoyed equal use of the property, their use of the property was interfered with, the GJCC suffered economic harm, and GJCC members suffered emotional distress.

## COUNT TWO:

### Deprivation of Equal Protection Under the Klan Act,
### 42 U.S.C. § 1985(3)

#### *Plaintiff v. All Defendants*

172. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

173. Section 1985(3) makes it unlawful for two or more persons to conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ." The statute provides a private right of action where any person does, or causes to be done, "any act in furtherance

35

of the conspiracy, whereby another individual is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1985(3). Such deprivation of rights may involve showing "(1) that 'some racial, or perhaps otherwise class-based, invidious discriminatory animus [lay] behind the conspirators' action[s], and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 286 (1993).

174. Defendants GDL, Minadeo, and Garland each agreed, coordinated and executed a common plan with at least one other person to interfere with the rights of Jewish people in Nashville to access places of public accommodation on an equal basis, and to use and hold real property on an equal basis ("GDL Conspiracy"). This conspiracy was motivated by animus based on religion.

175. Defendants Miller, Garland, Beaver, and Doe Defendants each agreed, coordinated and executed a common plan with at least one other person to interfere with the rights of Jewish people in Nashville to access places of public accommodation on an equal basis, and to use and hold real property on an equal basis ("Miller Conspiracy"). This conspiracy was motivated by animus based on religion.

176. Defendant Garland executed both conspiracies outlined above by intentionally discriminating against the GJCC by going in disguise to trespass and intimidating members and staff of the GJCC while on the GJCC's property.

177. In trespassing, menacing, and intimidating members and staff of the GJCC, Defendant Garland took an overt act to further both conspiracies.

36

178. Defendants' actions intentionally deprived Plaintiff and Plaintiff's members of their right to equal access to a place of public accommodation and to hold and use personal property. Because of Defendants' actions as described herein, and because those actions interfered with members' sense of safety on the GJCC campus, Plaintiff and Plaintiff's members altered their use of the GJCC including, but not limited to, initiating new security protocols and adjusting work schedules.

179. Garland was acting within the scope of his agency as an administrator and paid or unpaid employee of Miller's commercial enterprise, within furtherance of its business and at the command, direction or authorization of Miller, who participated in, directed, and ratified his actions.

180. Defendants Miller and GDL are vicariously liable for the violations of § 1985(3) by virtue of implicitly or expressly authorizing Garland's actions in invading the GJCC, as described herein, where Garland was acting as an agent of and to the benefit of Miller and/or GDL.

181. Defendants committed the acts herein alleged maliciously, fraudulently and oppressively with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiff. Further, the conduct of individual defendants Miller, Minadeo, Garland, Beaver, and/or Does was also authorized and/or ratified by an owner, officer, director or managing agent of Defendant Goyim Defense League and/or by Defendant Miller. In light of Defendants' willful, knowing and intentional discrimination against Plaintiff, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

182. As a proximate cause of the conspiracy described herein, the GJCC and its members' property rights were interfered with, the GJCC suffered economic harm, and GJCC members suffered emotional distress.

**COUNT THREE:**

**Failure to Prevent Interference with Civil Rights**
**Under the Ku Klux Klan Act of 1871, 42 U.S.C. § 1986**

*Plaintiff v. Garland, Miller, Beaver, John Does 1-3, and Jane Does 1-2*

183. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

184. This claim arises under 42 U.S.C. § 1986, which establishes liability for any person who knows that the wrongs conspired to be done as part of a section 1985 conspiracy are about to be committed, has power to prevent or aid in preventing those wrongs, and yet neglects or refuses to help prevent them.

185. Defendants Garland, Miller, Beaver, and Doe Defendants had actual knowledge that the wrongs conspired to be done as part of the Miller Conspiracy, as set out in this Complaint, were about to be committed, and neglected or refused to prevent or aid in preventing those wrongs.

186. Defendants Garland, Miller, Beaver and Does helped plan the Miller Conspiracy alleged above, had knowledge of it, and had the power to prevent or aid in preventing the wrongs conspired to be done. They made no reasonably diligent efforts to prevent the Miller Conspiracy from occurring and instead furthered the conspiracy by posting to GDL channels prior to the GJCC trespass to drum up interest and support for Garland's next act in furtherance of the conspiracy, encouraging Garland to trespass into the GJCC with the purpose of intimidating and harassing Jewish people, and remaining on the phone with

38

Garland to provide instructions and encouragement, while Garland intimidated and harassed GJCC's members and staff.

187. Plaintiff suffered damages, as outlined above, as a proximate cause of Defendants' neglect or refusal to prevent or aid in preventing the wrongful acts described above.

188. Defendants committed the acts herein alleged maliciously, fraudulently and oppressively with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiff. Such conduct was also authorized and/or ratified by an owner, officer, director or managing agent of Defendant Goyim Defense League and Defendant Miller. In light of Defendants' willful, knowing and intentional discrimination against Plaintiff, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

## COUNT FOUR:

### Trespass

#### *Plaintiff v. All Defendants*

189. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

190. On the evening of January 13, 2025, Defendant Garland intentionally entered the GJCC, a private, members-only center located in a building owned and operated by Plaintiff. When Garland arrived, the GJCC was about to close for the evening and the building was locked. He entered by virtue of his disguise and under the auspices of engaging in legitimate business.

191. Defendant Garland did not have a legal right or Plaintiff's consent to remain on Plaintiff's private property.

192. Garland refused multiple requests from people with apparent authority to stop his attempted entry into the restricted areas of the GJCC and/or to leave. The receptionist, who coordinates visitors' access to the building on behalf of Plaintiff, told Garland he could not access the secured area of the GJCC when he first entered; multiple GJCC members were forced to use their bodies to block his repeated attempts to further infiltrate into restricted areas of the building; and Plaintiff's security personnel resorted to physically escorting Garland out of the building after Garland ignored yet another request that he leave.

193. Defendant Garland's actions constitute trespass under Tennessee law, which he has admitted to by pleading guilty to that allegation in Davidson County Criminal Court case 2025-A-561.

194. Defendant Garland's act of trespass was an intended outcome, or at least a reasonably foreseeable outcome, of both the GDL Conspiracy and Miller Conspiracy.

195. Both conspiracies involved an agreement to deprive Plaintiff and Plaintiff's members of their right to hold and use personal property on an equal basis and to interfere with Jewish persons' equal access to places of public accommodation through acts of intimidation and harassment. All Defendants agreed to and were involved in the planning of their respective conspiracies outlined above and herein.

196. In trespassing, menacing, and intimidating members and staff of the GJCC, Defendant Garland took an overt act to further both conspiracies.

197. Garland was acting within the scope of his agency as an administrator and paid or unpaid employee of Miller's commercial enterprise, within furtherance of its business and at the command, direction or authorization of Miller, who participated in, directed, and ratified his actions.

40

198. Defendants Miller and GDL are vicariously liable for trespass by virtue of implicitly or expressly authorizing Garland's actions in invading the GJCC, as described herein, where Garland was acting as an agent of and to the benefit of Miller and/or GDL.

199. Defendants committed the acts herein alleged maliciously, fraudulently and oppressively with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiff. Further, the conduct of individual defendants Miller, Minadeo, Garland, Beaver, and/or Does was also authorized and/or ratified by an owner, officer, director or managing agent of Defendant Goyim Defense League and/or by Defendant Miller. In light of Defendants' willful, knowing and intentional discrimination against Plaintiff, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

200. As a result of Garland's trespass, Plaintiff suffered economic damage and invested in increased security services. Plaintiff's members also suffered emotional injury.

## COUNT FIVE:

### Fraudulent Misrepresentation

### *Plaintiff v. All Defendants*

201. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

202. On the evening of January 13, 2025, Defendant Garland knowingly donned a disguise in order to fraudulently enter the GJCC, a closed, private, members-only facility.

203. The false representation Garland made was a material fact in that he would not have been allowed to enter the GJCC and engage in his malicious harassment, intimidation, and civil rights violations but for his fraudulent misrepresentation.

204. Plaintiff, through its employee, reasonably relied on Garland's misrepresentation and suffered harm as a result.

205. Garland, Miller, Beaver, and all Doe Defendants concocted a scheme to accomplish by concerted action the unlawful purpose of using a disguise in order to gain entry into a secured building after normal operating hours and thereafter deprive Jewish citizens of their civil rights, and/or to harass, intimidate, and menace the members of the GJCC and larger Jewish community in Nashville.

206. Defendant Garland's act of fraudulent misrepresentation was a reasonably foreseeable outcome of both the GDL Conspiracy and the Miller Conspiracy.

207. Both conspiracies involved an agreement to deprive Plaintiff and Plaintiff's members of their right to hold and use personal property on an equal basis and to interfere with Jewish persons' equal access to places of public accommodation through acts of intimidation and harassment. All Defendants agreed to and were involved in the planning of their respective conspiracies outlined above and herein.

208. In trespassing, menacing, and intimidating members and staff of the GJCC while in disguise, Defendant Garland took an overt act to further both conspiracies.

209. Garland was acting within the scope of his agency as an administrator and paid or unpaid employee of Miller's commercial enterprise, within furtherance of its business and at the command, direction or authorization of Miller, who participated in, directed, and ratified his actions.

210. Defendants Miller and GDL are vicariously liable for fraudulent misrepresentation by virtue of implicitly or expressly authorizing Garland's actions in invading the GJCC, as described herein, where Garland was acting as an agent of and to the benefit of Miller and/or GDL.

211. Defendants committed the acts herein alleged maliciously, fraudulently and oppressively with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiff. Further, the conduct of individual defendants Miller, Minadeo, Garland, Beaver, and/or Does was also authorized and/or ratified by an owner, officer, director or managing agent of Defendant Goyim Defense League and/or by Defendant Miller. In light of Defendants' willful, knowing and intentional discrimination against Plaintiff, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

212. As a result of Garland's fraudulent misrepresentation and the conspiracy outlined above, Plaintiff suffered economic damages and had to invest in increased security services. Plaintiff's members also suffered emotional injury.

## JURY DEMAND

213. In accordance with the Seventh Amendment of the U.S. Constitution, FED. R. CIV. P. 38(b) and (c), and LR 7.03(c), Plaintiff respectfully demands a jury trial on all the issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays this Court grant the following relief:

214. A declaratory judgment that the actions described herein deprived Plaintiff and its members of their rights under federal and state law;

215. Injunctive relief enjoining Defendants from future violations of rights guaranteed by state and federal law; Nominal, compensatory, and punitive damages in an amount to be determined at trial;

216. An award of costs, including reasonable attorney's fees;

217. For pre-judgment interest; and

218.  Such other relief as the Court deems necessary and proper.

Respectfully submitted,

/s/ Benjamin K. Raybin
Benjamin K. Raybin (BPR #29350)

**RAYBIN & WEISSMAN, P.C**.
424 Church Street, Suite 2120
Nashville, Tennessee 37219
(615) 256-6666
(615) 254-4254 (fax)

**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
(404) 377-0708 (fax)

Scott D. McCoy
*pro hac vice pending*
Florida Bar No. 1004965

Elizabeth Littrell
*pro hac vice pending*
Georgia Bar No. 454949

Arusha Gordon
*pro hac vice pending*
D.C. Bar No. 1035129

Huey Fischer García
*pro hac vice pending*
Louisiana Bar No. 39571

**JOSEPH GREENWALD & LAAKE, PA**
6404 Ivy Ln., Ste. 400
Greenbelt, Maryland 20770

Erika Jacobsen White
*pro hac vice pending*
Maryland Bar No. 21815