IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| Gordon Jewish Community Center, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Civil Action No: 3:25−cv−01438 |
| | ) | |
| Goyim Defense League, Paul Miller, Jon | ) | |
| Minadeo II d/b/a Goyim Defense League, | ) | |
| Travis Garland, Jason Beaver, John Does 1- | ) | |
| 3, and Jane Does 1-2 | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS MINADEO AND GDL'S MOTION TO DISMISS**

**I.      Introduction and Summary of Argument**

Over ten days in July 2024, two dozen neo-Nazis descended on Nashville to terrorize Black and Jewish people. (Doc. No. 1 ¶¶ 62-67.) As they roved through the city, these neo-Nazis waved flags with swastikas and screamed racist and antisemitic slurs. (*Id.* at ¶¶ 67, 72-73, 78, 84.) Along the way they engaged in numerous acts of intimidation and aggression, including harassing a group of Black children, littering private property with antisemitic flyers, and viciously assaulting people that they believed to be Jewish or Black. (*Id*. at ¶¶ 67, 69-96.) This campaign of terror was led by Defendant Jon Minadeo and the unincorporated association he founded and operates, the Goyim Defense League ("GDL"). (*Id.* at ¶¶ 13, 18, 66.) GDL's mission includes declaring war on Jewish people and exterminating them. (*Id*. at ¶ 13.) In furtherance of that mission, its members regularly travel to cities across the country to intimidate and assault Black and Jewish people. (*Id.* at ¶¶ 26-27, 65.) GDL profits from its hate and violence through fundraising appeals, including some that highlighted GDL's Nashville intimidation tour. (*Id.* at ¶¶ 15-16, 23, 28, 80, 149.)

1

GDL's Nashville intimidation tour, derogatorily called the "Name the Nose Tour," was just the beginning of its efforts to target the Jewish community in Tennessee. (*Id.* at ¶¶ 20, 97.) During the tour, GDL members and/or associates broadcast their racist and antisemitic actions on various white supremacist platforms to drum up support and enthusiasm for additional acts of white supremacist violence. (*Id*. at ¶ 80.) GDL—through Defendant Minadeo and others—directed its members to continue their actions after the intimidation tour. (*Id.* at ¶¶ 29, 97-100.) Garland and several other GDL members heeded this call, discussing ways to harass, intimidate, assault, and even kill Black and Jewish people in Tennessee. *Id.*

In furtherance of these GDL objectives, Garland returned to Nashville with the purpose of infiltrating the Gordon Jewish Community Center ("GJCC"), a 120-year-old cultural institution that serves as a lynchpin of the Jewish community. (*Id.* at ¶¶ 1-2, 100.) Garland's decision to drive to Nashville to target the GJCC—rather than targeting a Jewish institution closer to his residence in Knox County—was driven by his desire to continue the GDL Conspiracy and objectives of the Nashville "Name the Nose Tour." (*Id.* at ¶ 143.) Significantly, one goal of Garland's excursion to Nashville was to drum up interest and financial support for GDL. (*Id.* at ¶¶ 104-05.) As the plan was developed and executed, Garland kept Minadeo updated, sought his approval, and obtained his and other GDL agents' assistance. (*Id.* at ¶¶ 144-45, 151, 153, 155.)

Garland was the man on the ground for the operation, twice traveling to the GJCC to unleash GDL's hate and harassment, using the same tactics of harassment and intimidation that GDL members and associates used during GDL's "Name the Nose Tour" a few months earlier. (*Id.* at ¶¶ 32, 100-08, 149, 152.) First, using a strategy previously employed by Minadeo himself, Garland donned a disguise as an Orthodox rabbi, entered the GJCC campus, and desecrated religious artifacts at Nashville's Holocaust Memorial which is located there. (*Id.* at ¶¶ 102-05,

152.) Second, while still disguised as a rabbi, he snuck into the GJCC building and refused to leave when directed to by staff there, pushing up against two men who tried to stop him. (*Id.* at ¶¶ 102-05, 108-16.) At both times, as with other GDL actions, Garland livestreamed his activities. (*Id.* at ¶¶ 30-32, 103, 105, 122.) Importantly, after both acts of harassment and intimidation, Garland reported back to the leader of GDL, Defendant Minadeo. (*Id.* at ¶¶ 151, 153, 155.) Garland was later arrested and convicted of several crimes relating to this intrusion, including civil rights intimidation, trespass, and assault. (*Id.* at ¶¶ 48, 123, 129-30.)

GJCC filed this lawsuit against GDL and several of its members, seeking damages and injunctive relief under federal and state law. Against Defendants Minadeo and GDL, the GJCC asserts four causes of action: Property Rights of Citizens under 42 U.S.C. § 1982 (Count 1); Deprivation of Equal Protection Under the Klan Act under 42 U.S.C. § 1985(3) (Count 2); Trespass under Tennessee law (Count 4); and Fraudulent Misrepresentation under Tennessee law (Count 5). (*Id.* at ¶¶ 160-82, 189-212.) Minadeo and GDL now move to dismiss all claims against them, contending that the Complaint fails to state a claim and that the Court lacks personal jurisdiction over them. (Doc. No. 17.) Their conclusory arguments cannot overcome the detailed factual allegations in the Complaint and are unsupported by the law.

Defendants' argument that the Complaint fails to state a claim should be rejected for several reasons. Plaintiff does not merely allege that Defendants conspired to espouse antisemitism as the Defendants claim. On the contrary, Plaintiff alleges that Defendants conspired to (1) deprive Plaintiff and Plaintiff's members of their right to hold and use personal property on an equal basis and (2) interfere with Jewish persons' equal access to places of public accommodation. Also, Plaintiff has sufficiently alleged that Defendants agreed to a shared plan with general objectives, which is all that is required to establish a conspiracy. The law does not require that *all* Defendants

were aware of *every* detail or act in furtherance of the plan. In addition, the fact that other explanations may exist for the Defendants' conduct does not warrant dismissal because Plaintiff's allegations only need to be plausible, not probable. Furthermore, Defendant GDL can be held liable for Garland's actions even if GDL was not aware of Garland's exact plan beforehand because Garland's acts were reasonably foreseeable. Lastly, the Complaint includes at least a dozen factual allegations establishing the plausibility of Plaintiff's claim that Garland, Minadeo, and GDL entered a conspiracy, and Garland's actions were in furtherance of that conspiracy.

Defendants' arguments on personal jurisdiction fare no better. First, both Minadeo and GDL purposefully availed themselves of the privilege of conducting activities in Tennessee; indeed, they do not dispute that they traveled to Tennessee and intentionally intimidated, harassed, and assaulted Black and Jewish people there—all while profiting from their activities there. Second, their conduct foreseeably caused emotional and economic harm to the GJCC in Tennessee, which more than suffices to show the required relationship between Defendants' contacts here and the claims in this lawsuit. Finally, litigating this case in Tennessee is reasonable and would not prejudice Defendants, who do not even try to argue otherwise. Thus, this Court may exercise personal jurisdiction over Defendants, and their motion to dismiss should be denied.

## II.    Argument and Authorities

Defendants' argument rests on two grounds. First, under Rule 12(b)(6), Defendants argue that the Complaint does not sufficiently allege a conspiracy between the co-conspirator who took the overt act, Garland, and either Defendants GDL or Minadeo. Second, under Rule 12(b)(2), they claim that the Court lacks personal jurisdiction over them and that GDL is not an entity that can be sued. As set out below, Plaintiff sufficiently alleges facts supporting its claims, and this Court has jurisdiction over Defendants. Thus, the Court should deny Defendants' motion in its entirety.

**A. Defendants' 12(b)(6) Motion Fails Because Plaintiff Alleges Sufficient Facts to Support Federal and State Conspiracies**

A motion to dismiss brought under Fed. R. Civ. P. 12(b)(6) "test[s] whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In order to sustain a claim under 42 U.S.C. § 1985(3), a party must allege: (1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) that results in injury or deprivation of any right or privilege of a citizenship. *Webb v. United States*, 789 F.3d 647, 671-72 (6th Cir. 2015); *Vakilian v. Shaw*, 335 F.3d 509, 518-19 (6th Cir. 2003); *Browder v. Tipton*, 630 F.2d 1149, 1150 (6th Cir. 1980); *Griffin v. Breckenridge*, 403 U.S. 88, 102-3 (1971). The Supreme Court requires that § 1985 claims contain allegations of "class-based, invidiously discriminatory animus." *Webb*, 789 F.3d at 672 (citing *Griffin*, 403 U.S. at 102).

To establish a claim of civil conspiracy under Tennessee law, a plaintiff must allege "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Pagliara v. Moses*, 605 S.W.3d 619, 627 (Tenn. Ct. App. 2020) (quoting *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)). A civil conspiracy is not an independent claim, but is instead a way to impose liability, thus a "[c]ivil conspiracy requires an underlying predicate tort allegedly committed pursuant to the

5

conspiracy." *Watson's Carpet and Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007); *see also ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 967 (M.D. Tenn. 2011). In *Chenault v. Walker*, No. W1998-00769-COA-RM-CV, 2000 WL 145062, at *8 (Tenn. Ct. App. Feb. 9, 2000), aff'd, 36 S.W.3d 45 (Tenn. 2001), the court pointed out that "[c]onspiracies are, by their very nature, secretive operations that can seldom be proved by direct evidence. Therefore, the existence of the conspiracy may be inferred from the relationship of the parties or other circumstances." 2000 WL 145062, at *8 (citing *Mohave Elec. Co-op, Inc. v. Byers*, 942 P.2d 451 (Ariz. App. 1997)). "It follows that a conspiracy may be proved by circumstantial evidence." *Id*. (citing *Hayes v. Schweikart's Upholstering Co.*, 402 S.W.2d 472, 481 (Tenn. Ct. App. 1965)).

Minadeo argues that Plaintiff failed to support its claims with sufficient facts to establish a conspiracy. GDL asserts that the "Complaint (sic) does not plausibly state any claim against either Jon Minadeo or the Goyim Defense League" and the "Complaint never charges anything substantive against Goyim Defense League." (Doc. No. 17 at 6.) These assertions are simply incorrect. As set out below, whether analyzed under federal or state law, the Complaint alleges sufficient facts to state a claim, and Defendants' motion should be denied.

   1. <u>Conspiracy Only Requires Agreement to a Single Plan with a Shared General Objective, Not Knowledge of the Plan's Details</u>

Defendants' argument that Plaintiff merely alleges that Defendants "'conspired' to espouse antisemitism" ignores and misrepresents the allegations. *See* Doc. No. 17 at 9; *Mayer*, 988 F.2d at 638 ("If an allegation is capable of several inferences, the allegation must be construed in a light most favorable for the plaintiff."). In fact, Plaintiff alleges that the Defendants and co-conspirator Garland agreed "to deprive Plaintiff and Plaintiff's members of their right to hold and use personal property on an equal basis and to interfere with Jewish persons' equal access to places of public

6

accommodation through acts of intimidation and harassment." Doc. No. 1 at ¶¶ 174, 195; *see also id*. at ¶ 6 ("The aim of Defendants' conspiratorial actions was to harass, intimidate, and menace the Jewish community and the GJCC [in order] to send a message that Jews are not safe anywhere, not even in their own private space.")) Despite Defendants' attempt to downplay their conduct and present them as simply "espous[ing]" antisemitic views, Plaintiff's allegations relate to their antisemitic *actions*, not their beliefs or statements. Doc. No. 17 at 9.

Defendants also misstate the law. Contrary to Defendants' assertions, there is no requirement—under either state civil conspiracy or 42 U.S.C. § 1985(3) —that all co-conspirators be aware of every detail involved in the effort to meet the conspiracy's objective. "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988); *see also United States v. Amawi*, 695 F.3d 457, 477 (6th Cir. 2012) (finding that in prosecuting a conspiracy case, the government need not prove that conspirators agreed on "the same targets or the same means"); *Russell v. Post*, 138 U.S. 425, 431 (1891) (holding that defendant "knew in a general way that a scheme existed" and "lent his aid" to accomplishing the conspiracy, so he could not "avoid his liability by proof that the exact nature and full details of the scheme were not communicated to him"); *Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 517 (6th Cir. 2020) (considering a claim for conspiracy under 42 U.S.C. § 1983 and finding that each conspirator need not know all of the details of the illegal plan and that the complaint plausibly alleged a single plan concerning retaliation against plaintiff for his speech).

Furthermore, the law only requires that "pleadings be plausible, not probable." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*648 F.3d 452, 458 (6th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (conspiracy

sufficiently alleged where petitioner, who had been denied service at defendant's restaurant, asserted that although she did not have knowledge of an agreement between the restaurant and police officer who arrested her, "the sequence of events created a substantial enough possibility of a conspiracy to allow her to proceed to trial"). The fact that "defendants' conduct has several plausible explanations" does not warrant dismissal because "[f]erreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *Watson Carpet & Floor Covering, Inc.*, 648 F.3d at 458; *see also Novak v. City of Parma*, 932 F.3d 421, 436 (6th Cir. 2019) ("allegations alone, even if conclusory or improbable" may be sufficient to plead a conspiracy at "this early stage of litigation"). This liberal standard makes sense because, at the motion to dismiss stage, the plaintiff has not yet had an opportunity to conduct discovery. *See Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.").

Application of these principles is well illustrated in *Memphis, Tennessee Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, where a labor union claimed police and security guards conspired to deprive them of their rights by "engag[ing] in a pattern of [] misconduct." 361 F.3d 898, 905-6 (6th Cir. 2004). The *Memphis* court, citing allegations in the complaint, held that:

> all of the elements of conspiracy are sufficiently alleged: it is alleged that a single plan existed ('was the result of an agreement'); that the conspirators shared in the general conspiratorial objective ('to deprive [the Union] of its rights, privileges and immunities'), and that an overt act was committed (that Memphis 'continuously conferred with agents of Phillips and Pro-Tech before confronting members of the [Union]' and 'that Phillips directed and conspired with the City of Memphis to

direct police officers to harass, threaten and intimidate the plaintiff") in furtherance of the conspiracy that caused injury (several violations are alleged).

*Id*. Here, all of the elements are likewise alleged: first, that a single plan existed (agreement to engage in a campaign to harass, intimidate and menace Jewish people in Nashville) (Doc. No. 1, ¶¶ 6, 62, 64); second, that the conspirators shared in the general conspiratorial objective ("to harass, intimidate, and menace the Jewish community and the GJCC and to send a message that Jews are not safe anywhere, not even in their own private space") (*id*.); and third, that an overt act occurred in furtherance of the conspiracy (Garland's travel back to Nashville to "storm[] the Jew temple" and "harass the Jews" using a disguise to gain access and commit trespass and assault) (*id*. at ¶¶ 62-64, 96-97, 100-03, 108-20, 127-28, 143-44, 149). Accordingly, the GJCC has alleged facts which, when accepted as true for purposes of this motion, state a claim against Defendants for which relief can be granted.

> *2.* Garland's Acts Were Foreseeable Outcomes of the Conspiracy with Minadeo and GDL

By arguing that Minadeo and GDL were not aware of Garland's exact action "beforehand," Defendants fail to acknowledge the principle of reasonable foreseeability. (Doc. No. 17 at 6.) Where a plaintiff has adequately pled that all defendants were part of the conspiracy, the plaintiff may hold each defendant liable for the reasonably foreseeable acts of their co-conspirators. The proposition that a defendant might be liable for the reasonably foreseeable acts of a co-conspirator, even if there is no agreement as to that specific act, breaks no ground. In *Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946), the Court found that it "is settled that 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act,'" (quoting *United States v. Kissel*, 218 U.S. 601, 608 (1910)). The Court went on to note that:

> A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the

9

plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

*Pinkerton*, 328 U.S. at 647-48; *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 496 (2023) ("conspiracy liability, [ ] typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy"); *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) ("[U]nder conspiracy law, he is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him"); *Willis v. Blevins*, 957 F. Supp. 2d 690, 700 (E.D. Va. 2013) (applying the reasonably foreseeable standard in a Section 1985(3) case).

3. <u>Contrary to Defendants' Misrepresentation of the Allegations, Plaintiff Alleges at Least a Dozen Facts Showing a Conspiracy</u>

Defendants ignore and misrepresent the allegations in the Complaint to argue that Plaintiff relied on only three facts to support their allegations of an agreement. In fact, the Complaint includes at least a dozen allegations supporting Plaintiff's claim that Garland was acting pursuant to his relationship with GDL and in pursuit of the objective he and Minadeo had agreed to, namely "to harass, intimidate and menace Jewish people in Nashville in order to create fear and anxiety so that Jews would not feel safe anywhere in Nashville." (Doc. No. 1 at ¶ 99.) In addition to supporting Plaintiff's 42 U.S.C. 1985(3) claim, these facts also support Plaintiff's state law conspiracy claims to show "a common design between two or more persons." *Pagliara v. Moses*, 605 S.W.3d 619, 627 (Tenn. Ct. App. 2020). Without limitation, those allegations include:

- Defendants Minadeo and Garland participated in the GDL Conspiracy discussions and traveled to meet in Nashville to take part in the first leg of the conspiracy. (Doc. No. 1 at ¶¶ 62-63.)

- GDL members, including Minadeo and Garland, kicked off their campaign of harassment by convening with other GDL associates in Nashville to further the GDL Conspiracy by, among other activities, physically confronting, provoking, harassing, intimidating, and assaulting people who they perceived to be, Jewish, Black, or otherwise not members of "the White race." (*Id*. at ¶¶ 63-64.)

- Participation by Minadeo and Garland in planning discussions, (*id.* at ¶¶ 62-63), regarding the conspiracy. These discussions took place on GDL channels of communication as well as in the rental home in which GDL members stayed in June and July 2024 (leading up to and during the first leg of the GDL Conspiracy). (*Id.* at ¶ 63.)

- GDL members, including Minadeo and Garland, illegally spread antisemitic propaganda in Nashville, and used footage of the violence, harassment, intimidation, and assaults in Nashville to further harm their victims through their online platforms. (*Id.* at ¶ 64.)

- Garland participated in the first leg of the conspiracy in Nashville by, among other activities, engaging in a dangerous demonstration on an Interstate 65 overpass, unlawfully attaching antisemitic propaganda to utility poles, and unlawfully distributing antisemitic propaganda on public and private property in neighborhoods near the GJCC. (*Id.* at ¶ 96.)

- Garland used GDL communication channels to raise funds for and announce his upcoming "Hate Week" actions, which included his targeting of the GJCC and which was in furtherance of the ongoing conspiracy. (*Id.* at ¶ 105.)

- Garland filmed and uploaded clips of his actions to the GDL channel in July 2024 and sent evidence and indicia of his ongoing activities in alignment with the conspiracy to Minadeo for approval. (*Id.* at ¶ 144.)

- Minadeo gave Garland approval for his ongoing unlawful targeting of Jewish people in Tennessee in furtherance of the conspiracy in the weeks prior to the GJCC trespass. (*Id.* at ¶ 146.)

- Garland's decision to drive to Nashville in order to target the GJCC – rather than targeting Jewish institution closer to his residence in Knox County – was driven by his desire to continue the GDL Conspiracy and objectives of GDL's Nashville "Name the Nose Tour." (*Id.* at ¶ 143.)

- Two days before Garland gained access to GJCC for the purpose of harassing and intimidating its members and Jewish community, Garland downloaded a GDL related icon for use as content and to brand his GJCC activities. (*Id.* at ¶ 150.)

- After infiltrating the GJCC the first time, and filming himself denigrating the Holocaust Memorial, Garland reported to Minadeo. Minadeo responded by sending approval of Garland's ongoing efforts to achieve the ongoing conspiracy's objective. (*Id.* at ¶ 151.)

- Five hours after his attempt to infiltrate the GJCC and before leaving Nashville to drive back to his home in Maryville, TN, Garland took a picture of the outside of the bar where the GDL attacked the young biracial man in July as part of the first leg of the conspiracy. (*Id.* at ¶ 152.)

11

- Once he was safely off the GJCC property, Garland called Minadeo to report that he was unhurt and to discuss his efforts to infiltrate the Jewish community center. (*Id*. at ¶ 153.)

These allegations paint a picture of two avowed antisemites and racists, Minadeo and Garland, who agreed to target Jewish people in Nashville to harass and intimidate them, and who took overt action to further that conspiracy.[1] Garland's antisemitic intrusion at the GJCC was of precisely the kind of activity contemplated by the "Name the Nose Tour" and surrounding discussions by Minadeo and other GDL members. Furthermore, Defendants' assertion that GDL lacks "organizational structure" does not excuse it from liability as a co-conspirator. *See United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (considering allegations of a criminal conspiracy involving drug dealing and finding that "defendants' focus on lack of hierarchy, formal structure, and developed distribution networks [] establishes that the SNP was less than a sophisticated narcotics business" but that "no threshold level of organizational sophistication is necessary to the formation of a conspiracy").

As set out above, Plaintiff is not relying on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. Plaintiff has established the "facial plausibility" required to "unlock the doors of discovery," because the "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79; *West v. Northcrest Med. Ctr.*, No. 3:20-CV-00002, 2020 WL 3469731, at *3 (M.D. Tenn. June 25, 2020).

---

[1] In addition to alleging liability based on a conspiracy, the Complaint includes allegations that Garland was acting as an agent of GDL, therefore making GDL vicariously liable for Garland's actions. (Doc. No. 1 at ¶¶ 169, 180, 198, 210.) GDL fails to challenge vicarious liability in its motion to dismiss, and this Court may thus deny its motion to dismiss on that basis alone.

**B. Defendant's 12(b)(2) Motion Fails Because Plaintiff Alleges Sufficient Facts to Show That Defendants Have Minimum Contacts to Attach Personal Jurisdiction**

To defeat a motion to dismiss under Rule 12(b)(2) challenging personal jurisdiction, a plaintiff need only make "a prima facie showing of jurisdiction." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) (quotation omitted). Pleadings and affidavits must be viewed in the light most favorable to plaintiff, and courts should "*not* weigh the controverting assertions of the party seeking dismissal." *Id.* (emphasis added) (quotation omitted). The Sixth Circuit uses this "relatively light standard" because "[a]ny other rule would empower a defendant to defeat personal jurisdiction merely by filing a written affidavit contradicting jurisdictional facts alleged by a plaintiff." *Id.* (quotations omitted). In addition, although a court may conduct an evidentiary hearing, it need not do so, especially when—as here—the defendant has not requested one. *See Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 506 (6th Cir. 2020).[2]

In federal question cases like this one, personal jurisdiction over a defendant exists if the defendant is subject to the forum's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant due process. *See Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). The Tennessee long-arm statute provides jurisdiction of nonresidents "as to any action or claim for relief" arising from any "tortious act or omission within this state" or any "transaction of business within the state." Tenn. Code Ann. § 20-2-214(a). Jurisdiction attaches even if the nonresident defendant acts through "an agent or personal representative." Tenn. Code Ann. § 20-2-214(c). The long-arm statute also extends to "corporations and all other entities which would be subject to service of process if present in this state." Tenn. Code Ann. § 20-2-214(b).

---

[2] Should the Court exercise its discretion to hold an evidentiary hearing, Plaintiff would welcome the opportunity to call witnesses and introduce additional evidence regarding Defendants' contacts with Tennessee.

Because the Tennessee long-arm statute has been interpreted as "coterminous with the limits on personal jurisdiction imposed by the due process clause," this Court need only address "whether exercising personal jurisdiction . . . is consistent with federal due process requirements." *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003) ("Where the state long-arm statute extends to the limits of the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process." (citing *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996)).

When, as here, Plaintiff alleges specific personal jurisdiction based on the allegations in the Complaint, this Court employs a three-part test to determine whether jurisdiction is appropriate under the due process clause:

> (1) the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state;
>
> (2) the claims must arise out of or relate to the defendant's contacts with the forum; and
>
> (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*See Stanley v. Nissan N. Am., Inc.*, 719 F. Supp. 3d 786, 815 (M.D. Tenn. 2024) (citations omitted). As detailed below, all three factors are present here.

4. <u>Defendants Purposefully Availed Themselves of the Privilege of Causing a Consequence in Tennessee</u>

To satisfy the first factor, a plaintiff must allege intentional actions by the defendant. This means that a defendant must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State. *See id.* "The contacts must be the defendant's own choice and not random, isolated, or fortuitous." *Id.* (quotations omitted). As the Sixth Circuit has

explained, this requirement may be satisfied by "a nonresident who deliberately engages in 'significant activities within a State.'" *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 550 (6th Cir. 2016) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985)). Here, both Minadeo and GDL purposefully chose Tennessee not only as the place to spread their hate and violence, but to encourage others to do the same—all while profiting from fundraising there.

Minadeo himself confirms in his affidavit that he traveled to Tennessee in July 2024 for the "Name the Nose Tour" described in the Complaint. (Doc. No. 17-1 at ¶ 3 (Defendant Minadeo's affidavit)). As the Supreme Court has held, "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). And as detailed in the Complaint, Minadeo's contacts with Tennessee were premeditated and prolonged:

- Beginning in or around spring and summer 2024, GDL and its associates began planning a campaign (an "Intimidation Tour") to target Nashville's Jewish community and communities of color (Doc. No. 1 at ¶ 62);

- Minadeo was responsible for logistical planning and chose Nashville as the site for this Intimidation Tour (Doc. No. 1 at ¶ 66);

- Minadeo traveled from his home to meet in Nashville to take part in the conspiracy (Doc. No. 1 at 63[3]);

- For ten days in July, Minadeo and others physically confronted, provoked, harassed, intimidated, and assaulted people in Nashville who they perceived to be Jewish, Black or otherwise not white (Doc. No. 1 at ¶¶ 64, 67); and

- In the months following the intimidation tour Minadeo provided guidance, assistance, and encouragement to Garland for the plan to target the GJCC. (Doc. No. 1 at ¶¶ 143-55.)

---

[3] Paragraph 63 in the Complaint mistakenly lists the date as July 2025; the actual date was July 2024, as the rest of the Complaint makes clear.

None of these factual allegations are disputed by Minadeo in his memorandum or his self-serving affidavit. Rather, Minadeo simply tries to minimize these actions by claiming that this was his one and only time ever visiting Tennessee. (Doc. No. 17-1 at ¶ 3.) However, there is no rule requiring more than one trip to a state before jurisdiction attaches, so Minadeo's ten-day campaign of intimidation and harassment in Tennessee in July 2024 is sufficient. Personal jurisdiction requires only that "the actions by the defendant *himself* [created] a substantial connection with the forum State." *AlixPartners*, 836 F.3d at 550 (emphasis in original).

Moreover, although Minadeo's own conduct while in Tennessee satisfies this standard, Minadeo also conspired with others to cause harm in Tennessee, which shows "a deliberate effort by the defendant to direct its activities toward, and to make contact with, the forum." *Receiver of Assets of Mid-Am. Energy, Inc. v. Coffman*, 719 F. Supp. 2d 884, 889 (M.D. Tenn. 2010). Either way, Minadeo has sufficient contacts in Tennessee to be sued there.

The same is true for GDL. GDL and its representatives acted "purposefully [to] avail" themselves in the forum state or cause "a consequence" there. Indeed, GDL likewise does not dispute any factual allegations in the Complaint about its conduct in and affecting Tennessee. These factual allegations include, but are not limited to, the following:

- In early 2024, GDL and its associates planned a campaign to target Nashville's Jewish community and communities of color. After extensive chats, messages, calls and other communications arranging travel, housing, and materials, GDL members initiated their conspiracy by traveling to Nashville in July 2024. (Doc. No. 1 at ¶ 62.)

- Antisemitic GDL flyers were illegally distributed in Knox County, Tennessee in October 2024. (Doc. No. 1 at ¶ 146.)

- GDL continues to engage in commercial activities in Tennessee, through its online platforms, such as GTV. (Doc. No. 1 at ¶¶ 16, 28-34.)

- GDL profits from the above activities—including through fundraising appeals that highlight GDL's Nashville intimidation tour. (Doc. 1 at ¶¶ 15-16, 23, 28, 31, 68, 80.)

16

These deliberate and substantial actions more than suffice to show that GDL purposefully availed itself of conducting activities in Tennessee. In fact, GDL regularly accepts sales and business from potential customers in Tennessee, (Doc. No. 1 at ¶¶ 30, 33-34), which also supports personal jurisdiction. *Neogen v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891-2 (6th Cir. 2002) (noting the difference between an entity that merely has a website accessible in the forum state and one that regularly "welcomed" business from customers in the forum state). As in *Neogen*, GDL deliberately acted "to do or cause an act or thing to be done in [the forum state]" and thus may be held accountable there. *Id.*

In sum, viewed in the light most favorable to Plaintiff, the allegations here show that, among other things, Minadeo, on behalf of GDL, (1) targeted and traveled to Tennessee to deprive Jewish people of their rights (Doc. No. 1 at ¶¶ 62-66), (2) spent two weeks in Tennessee leading the violent and racist actions by GDL's members (Doc. No. 1 at ¶¶ 64, 67, 74, 76, 89), and (3) conspired with Garland, a Tennessee resident, to continue the conspiracy's objective before and after Garland's actions that caused the harm underlying this lawsuit. (Doc. No. 1 at ¶¶ 47, 63-64, 96, 143-46, 149, 151, 153-55). That is more than enough to satisfy the purposeful availment prong.

5. This Lawsuit Arises from Defendants' Activities and Contacts in Tennessee

Not only did Minadeo and GDL purposefully avail themselves of the privilege of conducting activities in Tennessee, but those activities also form the heart of this litigation. This connection satisfies the second prong of the minimum contacts analysis: that the cause of action be "'related to' or 'connected with' the defendant's contacts with the forum state." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007) (quoting *Youn v. Track, Inc.*, 324 F.3d 409, 419 (6th Cir. 2003)). As the Sixth Circuit has explained, this is "a lenient standard," and a cause of action "need not formally arise from defendant's contacts." *Id.*

17

(quotations omitted). Rather, it is enough that "the causes of action were made possible by or lie in the wake of the defendant's contacts." *Id.* (quotations omitted).

This lenient standard is easily satisfied here. Again, accepting as true and viewing the facts in a light most favorable to Plaintiff, it was no mere coincidence that the illegal intrusion into the GJCC occurred after the violent "Name the Nose Tour" in Nashville. On the contrary, Minadeo and GDL designed the "Name the Nose Tour" to lay the groundwork for the illegal conduct at the GJCC. (Doc. No. 1 at ¶¶ 62-68.) Moreover, Minadeo and GDL themselves provided guidance, support, and encouragement for the illegal intrusion into the GJCC. (Doc. No. 1 at ¶¶ 143-55.) This was all part of the conspiracy and GDL's money-making model to profit off antisemitic conduct in Tennessee as well as its overall mission to intimidate Jewish people. (Doc. No. 1 at ¶ 15 ("GDL is a hate-for-profit enterprise that uses antisemitism and racism in combination with confrontation, provocation, harassment, intimidation and violence as tactics for monetary gain.")).

As alleged, the actions by Minadeo and GDL harmed Plaintiff and its members emotionally and financially. (Doc. No. 1 at ¶¶ 156-59.) When "it is possible" that a defendant's activities in the forum state "caused economic injury," the causal-connection prong of the personal jurisdiction standard is satisfied. *Neogen*, 282 F.3d at 892. Viewing the allegations most favorably to Plaintiff, this Court should find that the claims in this suit sufficiently relate to Defendants' deliberate contacts with Tennessee, thus establishing personal jurisdiction in this Court.

6. Jurisdiction in Tennessee is Reasonable

Litigation of this lawsuit in Tennessee would also be reasonable, satisfying the final prong of the minimum contacts analysis. As this Court has recognized, the general rule is that when the first two prongs are satisfied, "the reasonableness prong should be presumed satisfied, and the 'specific assertion of personal jurisdiction [is] proper.'" *Coffman*, 719 F. Supp. 2d at 890 (alteration in original) (quotations omitted); *see also AlixPartners*, 836 F.3d at 552 (holding that when the

first two criteria are met "only the unusual case will not meet this third criterion"). Here, Defendants failed to show that jurisdiction would be unreasonable: they do not argue that they would be prejudiced or burdened by litigating the case in Tennessee; they do not contend that Plaintiff lacks an interest in litigating in Tennessee; nor do they assert that another state would be better suited to adjudicate the claims. Thus, they forfeited any argument that this prong is not satisfied, and this Court should deny Defendants' motion to dismiss.

7.   Personal Jurisdiction Does Not Hinge on Conspiracy Liability

Rather than contest the elements of personal jurisdiction established by the Sixth Circuit, Defendants primarily argue that personal jurisdiction is inappropriate because it is based on a conspiracy theory of liability. (Doc. 17 at 11.) Not so. As detailed above, personal jurisdiction derives from Defendants' *own conduct* in and affecting Tennessee. To be sure, the Complaint also relies on actions of co-conspirators, but those actions only form an additional basis for jurisdiction, not the *sole* one. Thus, the Court need not reach Defendants' arguments on this point.

Nonetheless, personal jurisdiction may still be established based on a conspiracy theory of liability. Defendants identify no case holding that the due process clause would be violated by establishing personal jurisdiction on the actions of co-conspirators. Rather, the sole support for their argument is a 45-year-old Sixth Circuit decision declining to decide the issue. (Doc. 17 at 11 (citing *Chrysler Corp. v. Fedders*, 643 F.2d 1229 (6th Cir.1981))). In *Chrysler*, the Court left open for another day whether the due process clause allows for jurisdiction over an "absent coconspirator who has no other contact with the forum." 643 F.2d at 1236-37. But that is not the case here. As detailed above, Minadeo and GDL can hardly be described as *absent* conspirators given their extensive actions *in Tennessee*.

In any event, courts have made clear that the conspiracy theory of jurisdiction is available to establish personal jurisdiction. *See Chenault v. Walker*, case no., 2000 WL 145062 (Tenn. Ct.

App. Feb. 9, 2000) (adopting the test in *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982)), aff'd, 36 S.W.3d 45 (Tenn. 2001). In *Chenault*, the court agreed "with the many courts which have held that the in-state acts of a resident co-conspirator may be imputed to a nonresident co-conspirator to satisfy jurisdictional requirements under some circumstances." 2000 WL 145062, at *10 (*quoting Rudo v. Stubbs*, 472 S.E.2d at 516, 517 (Ct.App.Ga 1996) and citing *Allen v. Columbia Fin. Mgmt, Ltd.*, 377 S.E.2d 352 (S.C. App.1988)). Thus, personal jurisdiction exists no matter what theory is applied.

8. <u>GDL's Legal Status is Irrelevant to Personal Jurisdiction</u>

Defendants also claim that this Court may not exercise personal jurisdiction over GDL because it is "not a corporation, LLC, partnership, or any other type of organization." (Doc. No. 17-1 at ¶ 2; Doc. 17 at 14.) But Defendants offer no case law connecting personal jurisdiction to an entity's capacity to be sued. Whatever GDL's legal status is, the Complaint sufficiently alleges that GDL is an entity that purposefully engaged in activities in Tennessee sufficient to satisfy the Due Process Clause. That is all this Court needs to deny Defendants' motion to dismiss under Rule 12(b)(2).[4]

Should the Court wish to address GDL's capacity to be sued, two reasons dictate why GDL's motion should be denied. First, the question is an inherently factual determination that is not suitable for determination on a motion to dismiss. Second, even if GDL is not an

---

[4] When a party seeks dismissal based on a lack of capacity to be sued, courts usually consider the motion under Rule 12(b)(6). *See Doe v. Mckesson*, 945 F.3d 818, 824 n.2 (5th Cir. 2019) (collecting cases), *vacated on other grounds*, 592 U.S. 1 (2020). But here, GDL raises this issue solely in support of its motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction. GDL chose this procedural route so it could submit an affidavit in support: "whereas dismissal for failure to state a claim accepts factual allegations as true, personal jurisdiction allows for the filing of affidavits on the topic." (Doc. 17 at 13). But as detailed above and below, any factual disputes must be resolved at a later stage of this lawsuit because the Complaint sufficiently alleges minimum contacts by GDL in Tennessee.

unincorporated membership-based association, it is nonetheless an entity that engages in commercial activities and thus can be sued.

First, whether GDL is an unincorporated association (as Plaintiff alleges) or a "name for a social movement" and/or a "slogan" (as Defendants claim) (Doc. 17 at 5, 14) is an inherently factual determination that should not be made at the motion to dismiss stage. *See*, *e.g.*, *Davis v. Lifetime Capital, Inc.*, 560 F. App'x 477, 478 (6th Cir. 2014) ("The question of capacity is a mixed question of law and fact."); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1387 (9th Cir. 1984) ("[T]he nature of an entity and its ability to combine or conspire … is a fact question."); *Nexstar Broad., Inc. v. Granite Broad. Corp.*, No. 1:11-CV-249 RM, 2012 WL 2838547, at *8 (N.D. Ind. July 9, 2012) (agreeing that "an entity's nature and ability to combine or conspire is a fact question").

Determining whether GDL is an unincorporated association necessarily involves fact-finding. "Under federal law, an unincorporated association is a 'voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective.'" *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 628 (D.N.J. 2010) (quoting *Local 4076, United Steelworkers v. United Steelworkers, AFL–CIO*, 327 F. Supp. 1400, 1403 (W.D. Penn. 1971)); *accord Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921, 927 (9th Cir. 2014). Moreover, "[u]nder Federal Rule of Procedure 17(b) the determination of what constitutes an unincorporated association is made according to the law of the forum state." *Boynton v. Headwaters, Inc.*, 252 F.R.D. 397, 400 (W.D. Tenn. 2008) (citing *Coverdell v. Mid–South Farm Equip. Ass'n*, 335 F.2d 9, 12 (6th Cir.1964)). In *Boynton*, the court reviewed "Tennessee and other jurisdictions' case law" and determined that "voluntary and knowing membership is the hallmark of an unincorporated association." *Id*. at 401; *see also Hazel v. Beta Omicron Chapter of Sigma*

*Nu Fraternity House Corp.*, No. 4:08-CV-46, 2009 WL 677325, at *2 (E.D. Tenn. Mar. 12, 2009) (lack of charter weighed in favor of finding that fraternity was an unincorporated association). Certainly, Plaintiff will need to meet its evidentiary burden to show that GDL is a voluntary membership-based organization with a common objective and will do so after discovery has taken place. One self-serving declaration by a defendant at the outset cannot defeat a plaintiff's day in court. *See Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009) ("Rule 12(b)(6), besides some minor exceptions, does not permit courts to consider evidence extrinsic to the pleadings.").

Here, Plaintiff has clearly met its pleading burden. It has alleged the following non-exhaustive and non-speculative facts upon which it bases the assertion that GDL is a membership organization as well as a commercial entity:

- GDL is a mission-driven organization. (Doc. No. 1 ¶¶ 13-14, 17, 27, 38) (GDL mission includes "declaring war on Jewish people with the goal of exterminating and/or expelling them from the United States and Europe, subjecting Jews and people of color to harassment, intimidation and violence for the purpose of creating 'white nations,' and enlisting recruits to aid in achieving these objectives.")

- GDL conditions membership on agreement with its common purpose and organizational missions and requires adherence to its directives and its ideology. (Doc. No. 1 ¶¶ 13, 21.)

- GDL is a commercial enterprise "that uses antisemitism and racism in combination with confrontation, provocation, harassment, intimidation and violence as tactics for monetary gain." (Doc. No. 1 ¶¶ 15-16, 19-20, 26, 28-31, 33.)

- GDL owns property and assets. (Doc. No. 1 ¶¶ 16, 30, 33.)

- GDL sells merchandise and brands itself across the United States. (Doc. No. 1 ¶¶ 16, 23, 30, 33.)

- GDL sponsors and organizes hate-fest rallies across the country, including in Tennessee. (Doc. No. 1 ¶¶ 17, 20, 26-28.)

Moreover, because GDL holds itself out as an unincorporated association with a common purpose, it is universally recognized as such. *See¸ e.g.*, Chris Joyner, Hate group fueled by viral

videos, T-shirts, Atlanta Journal Constitution (June 30, 2023), https://www.ajc.com/news/investigations/hate-group-fueled-by-viral-videos-t-shirts/3E5VO6PAORBZVKMZ5BRWGFL75M/, (describing activities of Minadeo, the "leader of the hate group the Goyim Defense League"); WIKIPEDIA, https://en.wikipedia.org/wiki/Goyim_Defense_League (last visited February 20, 2026) (collecting information about members and their activities); Jesse O'Neill, *Neo-Nazis seen waving swastika flags outside multiple Georgia synagogues,* New York Post (June 25, 2023), https://nypost.com/2023/06/25/neo-nazi-wave-swastika-flags-outside-multiple-georgia-synagogues/, ("Several members of the hate group Goyim Defense League were pictured outside Chabad Lubavitch of Cobb County in the Atlanta suburb of Marietta on Saturday. The disturbing protest was led by the group's leader Jon Minadeo II.").

The New Jersey Office of Homeland Security and Preparedness describes Minadeo as a "user on a neo-Nazi Telegram channel [who] asked *members* to make donations in February 2023 to unrestricted payment platforms on behalf of the Goyim Defense League (GDL) and its leader, Jon Minadeo." *See Extremists Leverage Digital Currency for Illicit Financing,* New Jersey Office of Homeland Security and Preparedness, (June 03, 2024 at 8:33 ET), https://www.njohsp.gov/Home/Components/News/News/1350/2?os=vb_73kqvpgi&arch=1. When numerous objective observers recognize GDL as an association with members, one self-serving affidavit denying what appears to be obvious should be discounted. That GDL is an unincorporated membership association or entity falls under the "if something looks like a duck, walks like a duck, and quacks like a duck, then it is probably a duck" umbrella. *In re Sorah*, 163 F.3d 397, 401 (6th Cir. 1998).

Second, GDL is either a voluntary mission-driven membership organization that owns assets, or it is a commercial entity or enterprise with Minadeo as its founder, director and proprietor.[5] Either way, it can be sued for the actions of its agents Minadeo and Garland. Tennessee law defines "person" to include "any other legal or commercial entity." Tenn. Code Ann. § 61-3-101; *see also* Tenn. Code Ann. § 47–18–103(18) (under consumer protection law, organization includes "two or more persons having a joint or common interest, or any other legal or commercial entity"); Black's Law Dictionary (12th ed. 2024) at 571 (defining a "business enterprise" as a "for-profit company, business, or organization that provides financial, commercial, or industrial goods and services.")

In sum, GDL's argument that the organization's legal status (or lack thereof) somehow prevents it from suit should be dismissed. This is both because GDL's legal status is a factual question and therefore not suitable for consideration at this stage and because – regardless of whether GDL is a voluntary mission-driven membership organization that owns assets, or it is a commercial entity – it can be sued.

---

[5] Minadeo and GDL earned more than $100,000 in 2025 under the GDL logo on a video sharing website he created, GTV. Scripps News Group, *Neo-Nazi targeting kids online, teaching them to hate and prepare to kill* (Nov 19, 2025, at 6:47 ET), https://www.scrippsnews.com/science-and-tech/social-media/meet-the-neo-nazi-targeting-kids-online-teaching-them-to-hate-and-to-prepare-to-kill. ("Jon Minadeo courts kids in video chat apps, berating children of color, encouraging white kids to arm themselves for a 'races war'" and explaining that "Minadeo is founder of the so-called Goyim Defense League (GDL)").

## III.  Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(2) should be denied.

Respectfully submitted.

/s/ Scott D. McCoy

**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
Facsimile: (404) 377-0708

Scott D. McCoy
Florida Bar No. 1004965

Arusha Gordon
D.C. Bar No. 1035129

Huey Fischer García
Louisiana Bar No. 39571

Benjamin K. Raybin (BPR #29350)
**RAYBIN & WEISSMAN, P.C**.
424 Church Street, Suite 2120
Nashville, Tennessee 37219
(615) 256-6666
(615) 254-4254- fax

**JOSEPH GREENWALD & LAAKE, PA**
Erika Jacobsen White
Maryland Bar No. 21815

*Counsel for Plaintiff.*