IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **GORDON JEWISH COMMUNITY CENTER,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**GOYIM DEFENSE LEAGUE, PAUL MILLER, JON MINADEO II, TRAVIS GARLAND, JASON BEAVER, JOHN DOES 1-3, and JANE DOES 1-2,**<br><br>**Defendants.** | ) | **Case No. 3:25-cv-01438**<br>**Judge Aleta A. Trauger** |

**MEMORANDUM**

Plaintiff Gordon Jewish Community Center brings federal civil rights and state law claims against the Goyim Defense League and Jon Minadeo II. (Compl., Doc. No. 1.) These two defendants have filed a Motion to Dismiss (Doc. No. 17) under Federal Rules of Civil Procedure 12(b)(2) and (6). For the following reasons, the Motion to Dismiss will be denied in its entirety.

## I. BACKGROUND

### A. The Parties

The following factual allegations are taken from the Complaint and are accepted as true at the pleading stage. The Gordon Jewish Community Center ("GJCC") is a registered Tennessee nonprofit corporation and "cultural institution that has served as a lynchpin of the Jewish community of Nashville for more than 120 years." (Compl., Doc. No. 1 ¶ 1.) GJCC operates a community center on its privately-owned campus in Nashville where it offers a suite of youth, fitness, and senior programming and services. (*Id.* ¶¶ 2, 11–12.)

The Goyim Defense League ("GDL") is alleged to be a "hate-for-profit enterprise" that exploits antisemitism and racism—in combination with harassment, intimidation, provocation, and violence—for monetary gain.[1] (*Id.* ¶ 15.) GDL is a membership-based network that limits membership to those who share its mission for "declaring war on," "exterminating," and "subjecting Jews and people of color to harassment, intimidation[,] and violence for the purpose of creating 'white nations[.]'" (*Id.* ¶¶ 13, 21.) To advance this mission, GDL sponsors hate-based roadshows styled as "Intimidation Tours."[2] (*Id.* ¶ 17.) During Intimidation Tours, GDL's members and associates descend on towns with large Jewish and Black communities to harass, intimidate, threaten, and assault them. (*Id.* ¶¶ 20, 26–27.)

GDL commercializes its hatred by operating an online video and streaming platform—Goyim TV—where it publishes GDL-created and branded video footage of its members and followers' acts of harassment, intimidation, and violence. (*Id.* ¶¶ 16, 28.) GDL exploits this content to solicit donations from its members and followers who watch footage of these encounters and for the "opportunity to get recognized by GDL leaders and other white supremacists during livestreams." (*Id.* ¶¶ 31, 33.) GDL also operates an online store—Goyim Shop—where it sells GDL-branded products promoting the group's racist and antisemitic mission. (*Id.* ¶¶ 16, 30.) The merchandise marketed and sold by GDL includes Hitler masks, "swastika soap," and clothing with slogans such as "Gas the Jews With Us" and "Voting Will Not Remove Them." (*Id.* ¶¶ 23, 33.)

---

[1] The name "Goyim Defense League" itself is intended as an insult to Jewish people because it "mimics the names 'Jewish Defense League' and Anti Defamation League." (Doc. No. 17 at 5, 14.)

[2] Jon Minadeo II also refers to these tours as "Name the Nose Tours," a derogatory reference to an antisemitic trope regarding the noses of Jewish people that was prominent during Adolf Hitler's Nazi regime. (*Id.* ¶¶ 20, 72; *see also* Doc. No. 17-1 ¶ 3.)

The money generated from GDL-branded content and merchandise is then used to fund further acts of racist and religiously-motivated harassment, intimidation, and violence. (*Id.* ¶¶ 28, 33.)

### B. The Nashville Intimidation Tour

In 2024, GDL leadership and associates began planning a campaign to target Nashville's Jewish community and communities of color (the "Nashville Intimidation Tour"). (*Id.* ¶¶ 62–63.) The Nashville Intimidation Tour was spearheaded by Jon Minadeo II, the founder, president, chief executive officer, and "mastermind" behind GDL. (*Id.* ¶¶ 35, 37, 66.) Minadeo is a proud white supremacist who has publicly called for a race war and the extermination of Jewish and Black people or their removal from the United States. (*Id.* ¶¶ 19, 38.) In addition to defining GDL's mission and priorities, Minadeo also owns, manages, publishes on, and profits from Goyim TV and the Goyim Shop. (*Id.* ¶¶ 19, 21, 35.)

As with other Intimidation Tours, Minadeo organized, directed, and led the Nashville Intimidation Tour. (Doc. No. 1 ¶¶ 20, 66.) He received assistance from others, including Paul Miller and Travis Keith Garland. (*Id.* ¶¶ 62–63.) Miller is a neo-Nazi provocateur who also calls for a race war and encourages the harassment and abuse of people—including children—who appear to be Jewish, Black, or Brown. (*Id.* ¶¶ 39–40.) He capitalizes on this activity by creating and publishing racist and antisemitic content on various online streaming and merchandising platforms, including on GDL platforms. (*Id.* ¶¶ 39–40, 43.) Garland is an alleged member or associate of GDL and is employed as an "administrator" of Miller's "hate-for-profit video streaming enterprise." (*Id.* ¶ 47.)

#### ***1. The Nashville Intimidation Tour: Part 1***

After extensive planning, communication, and travel arrangements, Minadeo, Miller, Garland, and nearly two dozen other GDL members traveled to Nashville in mid-July 2024 for "the express purpose of harassing, threatening, intimidating, abusing, and menacing" people they

perceived to be Jewish and Black. (*Id.* ¶ 62.) For ten days, GDL rampaged through Nashville, waving swastika flags, screaming obscenities, and littering public and private property with antisemitic flyers. (*Id.* ¶ 67.) Not to be outdone, GDL members also harassed and intimidated four young Black children ranging in age from eight to eleven by calling them "monkeys" and various diminutives of the n-word, directed homophobic and other slurs at police officers who intervened and escorted the young children away, attacked a Jewish man, and brutally beat a biracial man. (*Id.* ¶¶ 69–94.) To top it off, the group threatened multiple people they perceived to be Jewish or Black, ran up to people and pretended that they were going to hit them, threw physical objects at people, and disrupted a meeting of the Metropolitan Nashville City Council. (*Id.* ¶ 95.) As Minadeo sees it, this conduct constitutes protected "free speech activism." (Doc. No. 17-1 ¶ 3.) GDL's acts were recorded by its members and published on online streaming platforms to fundraise and drum up support for additional acts of white supremacist violence. (Doc. No. 1 ¶¶ 68, 74, 80, 84, 91.)

### *2. The Nashville Intimidation Tour: Part 2*

GDL directs its members and followers to continue targeting Jewish and Black people "in real life" with additional acts of harassment, intimidation, and violence after the in-person part of a tour. (*Id.* ¶ 29.) GDL further directs its members and followers to record and share these "in real life" encounters, "either directly to GDL leadership or to upload via" Goyim TV to generate income and promote the group's "hate-for-pay scheme." (*Id.* ¶ 29, 31–33.)

The Nashville Intimidation Tour was no different in this respect. After the in-person part of the tour concluded, the group continued to target Nashville's Jewish and Black communities with hateful activities. For example, GDL members and followers threatened to "make Nashville the target" of World War III, to "jump" and "curb[] stomp to death" the young biracial man who was brutally beaten by GDL members (including by Minadeo, who "attempted to gouge out his eyes"), and to kill the Davidson County District Attorney after he filed criminal charges against

several GDL associates. (*Id.* ¶¶ 91, 97.) GDL members engaged in these post-rally activities "in person and on GDL platforms." (*Id.* ¶ 97.)

Garland was also eager to undertake "in real life" activities and "remained active with GDL and continued to update Minadeo on his efforts at intimidating Tennessee's Jewish communities" following the in-person rampage in Nashville. (*Id.* ¶ 145.) To that end, Garland "entered into a related and overlapping conspiracy" with Miller and other GDL associates to infiltrate the GJCC. (*Id.* ¶¶ 98, 100.) Like the in-person part of the Nashville Intimidation Tour, the purpose behind this conspiracy was to "harass, intimidate[,] and menace Jewish people in Nashville in order to create fear and anxiety so that Jews would not feel safe anywhere in Nashville." (*Id.* ¶¶ 99–100.) Miller, Garland, and others decided that "Garland would be the only conspirator on the ground in Nashville," with Miller and the other GDL associates assisting in "the criminal intrusion by providing direction, support, and encouragement before, during, and after the planned action." (*Id.* ¶ 100.)

On January 5, 2025, Garland traveled back to Nashville to launch the second wave of the Nashville Intimidation Tour. (*Id.* ¶ 101.) Disguising himself as an Orthodox Jewish man, Garland trespassed onto GJCC's private campus and live-streamed while he desecrated its Holocaust Memorial—"a sacred space on the campus of the GJCC,"—"to create content for the benefit of GDL." (*Id.* ¶¶ 102–03, 151.) Garland was in contact with Minadeo around the time of his initial trespass at the GJCC. (*Id.*) Minadeo encouraged Garland, writing that his intrusion and acts of desecration were "fu**ing awesome." (*Id.*)

About a week later, Garland returned to GJCC's campus in a similar disguise, but with the new goal of infiltrating its main community building. (*Id.* ¶ 108.) Once inside, Garland was turned away and directed to leave by GJCC's personnel. (*Id.* ¶¶ 111, 114.) Refusing to leave, Garland

"tried to get through doors to additional offices and community spaces in the GJCC." (*Id.* ¶ 114.) A GJCC member and another man stepped forward to block Garland from entering further into the building. (*Id.*) Garland then battered the two men in his attempt to gain further access to the building. (*Id.* ¶ 115.) He was eventually escorted out of the building by the nonprofit's security guard. (*Id.* ¶ 116.) After being escorted outside, Garland and others participating in his livestream remotely "hurled racial slurs at the security guard, who was of Asian descent." (*Id.* ¶ 118.)

Once off GJCC's property, Garland stalked the perimeter of the campus, trying to find another entrance. (*Id.* ¶ 122.) All the while, Garland remained on the phone with other GDL associates and livestreamed his trespass for viewers. (*Id.* ¶¶ 109, 114, 118, 127, 134.) He also spoke with Minadeo "to report that he was unhurt and to discuss his efforts to infiltrate the Jewish community center." (*Id.* ¶ 153.) By his own alleged admission, Garland "stormed" the GJCC's "[J]ew building" for the purpose of "harassing" the cultural center and its members. (*Id.* ¶¶ 127–28.) Garland's activities also served GLD's bottom line: to commercialize antisemitism by capturing video footage that could be disseminated through GDL communication channels and on Goyim TV to raise funds for even more racist and antisemitic activity. (*Id.* ¶¶ 104–05, 127, 149–50, 154.) Garland used GDL branding to promote his activities at the GJCC. (*Id.* ¶¶ 105, 149–50.) Garland also discussed efforts with Minadeo to infiltrate the GJCC and discussed the second operation with Minadeo right after it concluded. (*Id.* ¶¶ 145–46, 151, 153, 155.) Garland was later arrested and pled guilty to civil rights intimidation, assault, and trespass for his criminal activities at the GJCC. (*Id.* ¶¶ 123, 129–30.)

## II. PROCEDURAL HISTORY

In December 2025, GJCC filed its Complaint, asserting four causes of action against GDL and Minadeo for federal civil rights violations under 42 U.S.C. §§ 1982 and 1985(3) and claims

under Tennessee law.[3] (*Id.* ¶¶ 8, 160–82, 189–212.) GJCC invokes this court's jurisdiction under 28 U.S.C. § 1331 for its federal civil rights claims (Counts 1 and 2) and 28 U.S.C. § 1367 for its state law claims (Counts 4 and 5) that arise out of the same underlying facts as the federal law claims. (*Id.* ¶ 8.)

In January 2026, GDL and Minadeo filed a Motion to Dismiss (Doc. No. 17) under Federal Rule of Civil Procedure 12(b)(2) and (6) that failed to comply with the requirements of Local Rule 7.01(a)(2).[4] GJCC has filed a Response in Opposition to the Motion to Dismiss. (Doc. No. 25.) GDL and Minadeo later filed a reply in support of their Motion. (Doc. No. 27.) On September 16, 2026, the court issued a Memorandum & Order directing the parties to file supplemental briefing on whether GDL and Minadeo forfeited their personal jurisdiction defenses under Rule 12(b)(2) by asking the court to rule on their merits-based defenses under Rule 12(b)(6). (Doc. No. 47.) Instead of grappling with that issue, the court herein rules on both prongs of the Motion.

## III. DISCUSSION

### A. Personal Jurisdiction

The defendants move to dismiss the Complaint for lack of personal jurisdiction under Rule 12(b)(2). According to the defendants, this court cannot exercise personal jurisdiction over them for two reasons. First, the defendants argue that personal jurisdiction is lacking in this court because neither defendant is a citizen of Tennessee, nor have they availed themselves of the privilege of conducting activities in Tennessee. (Doc. No. 17 at 11–12.) Second, the defendants

[3] The Complaint names other defendants, but the pending Motion to Dismiss was filed by GDL and Minadeo only.

[4] The pending Motion to Dismiss was not accompanied by a separately filed memorandum of law. Instead, the memorandum of law was incorporated into the motion. Local Rule 7.01(a)(2) provides that memorandums of law incorporated into the motion "must be clearly titled as a 'MOTION AND MEMORANDUM OF LAW." L.R. 7.01(a)(2). The defendants' submission does not comply with this rule.

argue that GDL is not capable of being sued in any court because GDL is not a real legal entity. (*Id*. at 12–14.) Instead, the "Goyim Defense League" is a "satirical name" that is meant to disparage Jewish people. (*Id*. at 5, 14.) As further detailed below, the court rejects each of the defendants' arguments and finds that personal jurisdiction exists over GDL and Minadeo in this court.

District courts have discretion to decide a 12(b)(2) motion "on the pleadings alone, permit discovery on the issue, or conduct an evidentiary hearing to resolve factual questions." *Karri v. BMW (US) Holding Corp.*, No. 3:22-cv-00528, 2023 WL 3131990, at *9 (M.D. Tenn. Apr. 27, 2023) (citing *See, Inc. v. Imago Eyewear Pty.*, Ltd., 167 F. App'x 518, 520 (6th Cir. 2006)). When, as here, the court rules without conducting an evidentiary hearing, the plaintiff bears a "relatively slight" burden in establishing a *prima facie* showing that personal jurisdiction exists. *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 899 (6th Cir. 2017). In considering whether the plaintiff has satisfied this burden, the court may accept as true the (1) allegations in the complaint that are uncontroverted by the defendant; (2) averments in the plaintiff's declarations (even if contradicted); and (3) defendant's undisputed factual assertions. *Concord Music Grp., Inc. v. Anthropic PBC*, 738 F. Supp. 3d 973, 980 (M.D. Tenn. 2024) (Crenshaw, J.) (quoting *Ncontracts LLC. v. Holmberg*, 2022 WL 17724148, at *3 (M.D. Tenn. Dec. 15, 2022)). The court considers the pleadings and affidavits "in a light most favorable to the plaintiff[]." *MAG IAS Holdings, Inc.*, 854 F.3d at 899 (citation and quotation marks omitted).

GJCC asserts that specific personal jurisdiction over GDL and Minadeo exists here. (Doc. No. 25 at 14.) "Personal jurisdiction may be found either generally or specifically." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012). The court has specific jurisdiction "only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state." *Id.*

at 679. For specific jurisdiction to exist in a federal question case, the exercise of specific personal jurisdiction "must be both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016) (citations omitted). It is well-settled that Tennessee's long-arm statute—T.C.A. § 20-2-214—is coextensive with the constitutional limits on personal jurisdiction, meaning that "the jurisdictional limits of Tennessee law and of federal constitutional law of due process are identical." *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005). Accordingly, GJCC need only show that personal jurisdiction over the defendants comports with constitutional due process requirements.

Courts in the Sixth Circuit employ a "three-part test for determining whether, consistent with due process, a court may exercise specific personal jurisdiction." *Youn v. Track, Inc.*, 324 F.3d 409, 418 (6th Cir. 2003). First, "the defendant must purposefully avail himself of the privilege of acting in the forum state or caus[e] a consequence in the forum state." *Id*. Second, "the cause of action must arise from the defendant's activities there." *Id*. Third, "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id*. Each of these requirements must be met for the court to exercise personal jurisdiction over GDL and Minadeo.

The uncontroverted allegations in the Complaint amply satisfy the first prong of the test. GJCC alleges that GDL sponsors "Intimidation Tours" around the country that are designed to target individuals perceived to be Jewish, Black, or Brown. (Doc. No. 1 ¶¶ 20, 26–27.) These tours are led by Minadeo—the founder and head of GDL. (*Id*. ¶ 20.) Minadeo was the mastermind behind the Nashville Intimidation Tour. (*Id*. ¶¶ 37, 62–66.) In July 2024, Minadeo led the group's members into Nashville and unleashed terror for nearly two weeks. (*Id*. ¶¶ 64, 67–95.) GDL and

Minadeo exploited this hate for commercial gain by livestreaming and publishing members' video footage of the Nashville Intimidation Tour on the group's online platforms—platforms that Minadeo owns, manages, and profits from. (*Id.* ¶¶ 35, 68, 74, 80, 84, 91.)

Obeying GDL's directive to continue its harassment "in real life" (*id.* ¶ 29), Garland—an active GDL member—set his sights on attacking the GJCC to further target Nashville's Jewish communities. (*Id.* ¶¶ 29, 98–100.) He ultimately launched two separate "in real life" attacks on the GJCC in January 2025. (*Id.* ¶¶ 98–121.) Garland associated his attacks on the GJCC with GDL and remained in contact with Minadeo throughout the relevant period. (*Id.* ¶¶ 32–33, 103–05, 109, 149–50, 154.) Garland also recorded and livestreamed his activities to "raise[] funds on [Goyim TV] to engage in more antisemitic and racist activity" and "to create content for the benefit of GDL." (*Id.* ¶¶ 105, 151.) Minadeo remained in contact with Garland over the course of the two attacks on the GJCC and allegedly encouraged Garland's attacks. (*Id.* ¶¶ 145–46, 151, 153.)

These allegations reveal that GDL and Minadeo have engaged in significant activities in Tennessee sufficient to satisfy the purposeful availment prong of the test. Contrary to the defendants' vague protest that the allegations fail to establish "minimum contacts with Tennessee" (Doc. No. 17 at 11), the allegations demonstrate the opposite: an organization and its managing agent traveling to and remaining in Tennessee for nearly two weeks, documenting their harassment, intimidation, and acts of violence directed at citizens of Tennessee, profiting from their targeting of Tennessee's citizens, encouraging members to engage in more hateful activities in Tennessee, and financially benefiting from the group's members' continued harassment, intimidation, and otherwise unlawful activities perpetrated in Tennessee. If those uncontroverted allegations do not amount to purposeful availment, nothing does.

The second requirement of the test is also satisfied because GDL and Minadeo's activities directed at Tennessee relate to the civil rights violations alleged in this case. GJCC has alleged that Garland—"a member and/or associate of GDL"—put into action a directive set down by GDL and Minadeo to continue to harass, intimidate, and engage in acts of violence against Jewish, Black, and Brown communities. (Doc. No. 1 ¶¶ 47, 20–21, 29, 98–129.) Garland and others embraced this organizational directive by launching two separate attacks on the GJCC—attacks that were encouraged by Minadeo and launched for GDL and Minadeo's commercial gain. (*Id.* ¶¶ 104, 105, 145–46, 151, 153.)

Finally, the third requirement of the test is met. When the first two requirements of the personal jurisdiction test are met, "there is an inference of reasonableness and 'only the unusual case will not meet this third criteria.'" *MAG IAS Holdings, Inc.*, 854 F.3d at 903–04 (quoting *Air Prods. & Controls, Inc. v. Safetech Intern., Inc.,* 503 F.3d 544, 554 (6th Cir. 2007)). As the GJCC points out, the defendants do not even "argue that they would be prejudiced or burdened by litigating this case in Tennessee." (Doc. No. 25 at 19.) The court agrees. *See Premedics, Inc. v. Zoll Med. Corp.*, No. 3:06-0716, 2007 WL 3012968, at *6 (M.D. Tenn. Oct. 9, 2007) (Nixon, J.) (finding the reasonableness prong met when the "[d]efendants provide[d] no considerations that would render the exercise of personal jurisdiction by this Court unreasonable.").

The court is also not persuaded by the defendants' argument that GDL's legal entity status prevents the court from exercising personal jurisdiction here. As the defendants tell it, GDL "is no entity at all," but is instead a "satirical name" adopted by Minadeo to disparage Jewish people. (Doc. No. 17 at 14.) For support, Minadeo filed a one-page declaration in which he declared that GDL "is not a corporation, LLC, partnership, or any other type of organization." (Doc. No. 17-1 ¶

2.) Relying on this single sentence, the defendants assert that GDL is not capable of being sued because it is not subject to the personal jurisdiction of any court. (Doc. No. 17 at 14.)

The defendants' argument regarding GDL's legal status is essentially a capacity argument. In the Sixth Circuit, the capacity to be sued is generally treated as an affirmative defense (not a jurisdictional issue) on which the defendant bears the burden of proof. *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 478 n. 2 (6th Cir. 2014); *Grady v. Madison Cnty., Tennessee*, No. 1:19-cv-01153, 2020 WL 3036891, at *3 (W.D. Tenn. June 5, 2020) ("Ms. Grady's capacity, or lack thereof, would have no impact on the Court's subject-matter jurisdiction under Article III."). Of course, the court can grant a motion to dismiss on the basis of an affirmative defense if the allegations in the complaint conclusively establish that the defendant is entitled to the asserted defense as a matter of law. *Bushong v. Delaware City School Dist.*, 851 F. App'x 541, 545 (6th Cir. 2021). That is not the case here.

In the Complaint, GJCC has made a series of allegations which directly contradict the defendants' capacity defense. GJCC specifically alleges that GDL is a membership-based organization, Minadeo founded and currently manages GDL, and GDL controls various assets (including Goyim TV). (Doc. No. 1 ¶¶ 13, 15–16, 33.) Those allegations create the reasonable inference that GDL may be some kind of legally recognized entity and are enough to withstand dismissal at the pleading stage based on the defendants' capacity defense.

For the foregoing reasons, the court finds that personal jurisdiction exists over GDL and Minadeo. Consequently, the Motion to Dismiss for lack of personal jurisdiction under Rule 12(b)(2) will be denied.

### B. Failure to State a Claim

The defendants also seek dismissal of the Complaint under Rule 12(b)(6) for failure to state a claim. (Doc. No. 17 at 1, 6–11.) To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Cooperrider v. Woods*, 127 F.4th 1019, 1027 (6th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim has facial plausibility when the allegations in the complaint contain enough factual content to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. The court must accept the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor to determine whether a complaint states a facially plausible claim. *Mich. First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 425 (6th Cir. 2024). Nevertheless, the facial plausibility standard is not met when the allegations are mere threadbare recitals of the elements of a cause of action, supported by mere conclusory statements. *Iqbal*, 556 U.S. at 678.

At the outset, the court notes that GDL and Minadeo do not specifically address the four claims (Counts 1–2, 4–5) asserted against them in any detail. Instead, the defendants seem to argue that the four claims fail as a matter of law because the Complaint's allegations do not plausibly establish that either defendant *conspired* with Garland, Miller, and other GDL members and followers to harm the GJCC. (Doc. No. 17 at 6–7, 10.) According to the defendants, the allegations establish, at most, that GDL, Minadeo, and Garland "share similar ideological goals, namely their opposition to Jews and other minorities" and "that they previously marched together" during the in-person part of the Nashville Intimidation Tour where GDL members and followers "got into a couple of fights" and "just called black people some harsh names." (*Id*. at 3, 8–9.) In the defendants' view, these allegations are insufficient to establish a conspiracy to harm the GJCC.

(*Id*. at 6.) The defendants also dispute as a factual matter whether the Nashville Intimidation Tour "ever involved bothering the [GJCC], tortiously or otherwise." (*Id*. at 10.)

In opposition, GJCC argues that the defendants' central argument for dismissal "ignores and misrepresents the allegations." (Doc. No. 25 at 6.) Specifically, GJCC argues that the conspiracy is not based on antisemitic *beliefs* or *statements*. (*Id*. at 6–7.) Instead, the conspiracy was "to deprive Plaintiff and Plaintiff's members of their right to hold and use personal property on an equal basis and to interfere with Jewish persons' equal access to places of public accommodation through *acts* of intimidation and harassment." (*Id*. at 6–7 (quoting Doc. No. 1 ¶¶ 174, 195) (emphasis added)).) After careful consideration, the court finds that the Complaint alleges enough factual material to infer the existence of a conspiracy at this stage, requiring denial of the defendants' Motion under Rule 12(b)(6).

To establish a civil conspiracy under federal civil rights statutes, a plaintiff must show that (1) a single plan existed between the defendants; (2) the defendants shared in a general conspiratorial objective to deprive the plaintiff of his constitutional or federal statutory rights; (3) an overt act was committed in furtherance of the conspiracy; and (4) the overt act caused injury to the plaintiff. *Gerber v. Herskovitz*, 14 F.4th 500, 511 (6th Cir. 2021). Here, the Complaint's allegations are sufficient to draw the inference that GDL and Minadeo participated in a conspiracy to harm the GJCC.

First, GJCC has alleged that a plan existed between GDL and Minadeo, on the one hand, and Garland, Miller, and other GDL members and followers, on the other hand. According to the Complaint, Minadeo—acting in concert with Miller, Garland, and other GDL members and followers—planned to target Nashville's Jewish and Black communities with harassment, intimidation, and violence. (Doc. No. 1 ¶¶ 62, 63, 174.) This plan was hatched "[a]fter extensive

chats, messages, calls, and other communications" over "GDL channels of communication" and in a "Kentucky rental home in which GDL members stayed during the first leg of the" Nashville Intimidation Tour. (*Id.* ¶¶ 62–63.) The in-person part of the Nashville Intimidation Tour "was just the beginning of [GDL and Minadeo's] efforts to target" the Nashville Jewish community. (Doc. No. 25 at 2.) The plan expanded as GDL and Minadeo "directed" the group's members and followers to launch follow-on waves of "in real life" acts of harassment, intimidation, and violence against Nashville's Jewish and Black communities. (Doc. No. 1 ¶¶ 29–33.) Minadeo also discussed efforts with Garland to further target Jewish communities throughout the relevant period, remained in contact with Garland as he launched multiple assaults on the GJCC, and spoke with Garland immediately after his second trespass at the GJCC. (*Id.* 1 ¶ 145–46, 151, 153.) These allegations, accepted as true, amount to a plan.

Second, the Complaint contains enough factual detail to plausibly allege that GDL and Minadeo shared a "general conspiratorial objective" with Garland and others to violate the GJCC and its members' federal civil rights protections by (1) depriving the GJCC and its members of their right to hold and enjoy property on an equal basis; and (2) interfering with the GJCC and its members' equal access to places of public accommodation.[5] (Doc. No. 1 ¶¶ 6, 27, 38, 98–100, 124, 128.) For support, the Complaint alleges that Garland is a member of GDL and remained active with the group after the in-person part of the Nashville Intimidation Tour. (*Id.* ¶¶ 47, 145.) Garland and Minadeo continued to discuss efforts to further target Tennessee's Jewish communities with "in real life" acts of harassment, intimidation, and violence—activities that GDL

---

[5] GJCC alleges that its campus in Nashville is a place of public accommodation. (Doc. No. 1 ¶¶ 12, 158.) Neither GDL nor Minadeo challenge this legal assertion in their Motion to Dismiss.

and Minadeo explicitly direct members and followers to engage in to promote on the group's online platforms, such as Goyim TV. (*Id.* ¶ 29, 31–33, 97.)

Embracing his leader's directive, Garland launched an "in real life" campaign that culminated with two separate attacks on the GJCC in January 2025. (*Id.* ¶¶ 98–121.) By his own alleged account, Garland's trespasses served the objective of "harassing" Nashville's Jewish community—the same organizational objectives articulated by Minadeo during the GDL-sponsored Nashville Intimidation Tour. (*Id.* ¶¶ 21, 37–38, 62, 64, 127–28.) Garland further associated his activities with GDL by using the group's branding and documenting his activities for use on GDL's streaming and communication platforms—platforms that GDL and Minadeo own, manage, and profit from. (*See, e.g.*, *id.* ¶¶ 16, 30–33, 35, 68, 103–05, 109, 149–50, 154.) These allegations are enough to plausibly establish a "general conspiratorial objective."

The allegations also satisfy the third and fourth requirements for inferring a civil conspiracy at this stage. The third requirement can be established by demonstrating that an underlying tort was committed in the course of the conspiracy. *Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1020 (E.D. Tenn. 2022). GJCC's allegations meet the third requirement because it is undisputed that Garland travelled to Nashville and trespassed onto the GJCC's private property. (*Id.* ¶¶ 48, 130, 193.) Tennessee recognizes trespass as an intentional tort. *Kite v. Hamblen*, 241 S.W.2d 601, 603 (1951).

GDL and Minadeo's assertion that liability does not reach them because they were unaware of Garland's "intent to cause a specific, illegal harm" (Doc. No. 17 at 10) is not dispositive at the motion to dismiss stage because "conspiracy liability . . . typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 496 (2023). The question of reasonable foreseeability, however, is almost always a factual

question that is not appropriately resolved at the motion to dismiss stage. *Paavola v. United States*, 459 F. Supp. 3d 21, 39 (D.D.C. 2020). Finally, the allegations demonstrate at this stage that Garland's trespass injured the GJCC and its members. GJCC alleges that it was required to spend additional money for increased security services after Garland's criminal trespasses, which constitutes economic damages. (Doc. No. 1 ¶ 200.) Other damages were suffered, including Garland's battery of a GJCC member and visitor. (*Id*. ¶ 115.)

At any rate, the allegations are also sufficient to plausibly establish that GDL and Minadeo are vicariously liable for Garland's tortious activities based on a principal-agent relationship. (*Id*. ¶¶ 169, 180, 198, 210.) The allegations supporting this separate and independent basis for imposing liability on GDL and Minadeo include the following:

- Minadeo is "GDL's president and chief executive officer" and "directs GDL and its members";
- "GDL conditions membership on agreement with its common purpose and organizational missions and requires adherence to its directives as set out by Minadeo";
- Minadeo organized and led the Nashville Intimidation Tour;
- After an in-person tour, "GDL members are directed to continue their actions 'IRL,' also known as 'in real life' activities and to upload or send video and documentation either directly to GDL leadership or to upload via GTV";
- Garland is a member and/or associate of GDL;
- Garland participated in the in-person part of the Nashville Intimidation Tour;
- Garland "remained active with GDL and continued to update Minadeo on his efforts at intimidating Tennessee's Jewish communities" following the in-person part of the Nashville Intimidation Tour;
- Garland embraced GDL's directive and launched two "in real life" attacks on the GJCC;
- Garland promoted his criminal activities at the GJCC on GDL's online platforms and channels of communication "to create content for the benefit of GDL" and for the purpose of commercializing antisemitism;

- Garland further promoted his criminal activities for GDL's benefit by using GDL branding and soliciting funds through GDL channels of communication to fund further acts of racist and antisemitic hate; and

- Garland remained in contact with Minadeo throughout the relevant period, including immediately after his second criminal trespass of the GJCC;

- Minadeo encouraged Garland's criminal activities targeting the GJCC.

(*Id.* ¶¶ 20–21 29, 31, 35, 37, 47, 63–64, 98–121, 149–151, 153.) GDL and Minadeo do not respond to GJCC's charge that Garland was a GDL agent. *See White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 723–24 (Tenn. 2000) ("[A] principal may be held liable for an agent's tortious act, even if that act occurs outside of the scope of the agency" and the principal did not "expressly direct or have knowledge of the act done," so long as the "agent was acting in the business of his superior.") (internal quotation marks and citations omitted). The defendants' failure to even respond to the allegations that Garland was a GDL agent acting at the direction of GDL and Minadeo provides an independent basis to deny the Motion to Dismiss.

## IV. CONCLUSION

For the reasons stated herein, the defendants' Motion to Dismiss the Complaint under Rules 12(b)(2) and 12(b)(6) will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge